[Crim. No. 20132. Feb. 21, 1979.]

THE PEOPLE, Plaintiff and Appellant, v.
JAMES BACKUS et al., Defendants and Respondents.

362

**COUNSEL**

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, W. Eric Collins and Sanford Svetcov, Deputy Attorneys General, for Plaintiff and Appellant.

Cominos, Shostak & Epstein, Eugene Epstein, Lawrence Shostak, Joseph F. Landreth and James A. Michael for Defendants and Respondents.

**OPINION**

**MANUEL, J.**—The People appeal from an order setting aside a three-count indictment charging defendants Backus, Joseph, and Ward in count I with conspiracy to pervert and obstruct justice and the due

administration of the laws (Pen. Code, § 182, subd. 5),[1] defendants Joseph and Ward in count II, and all three defendants in count III, with conspiracy to furnish heroin (Pen. Code, § 182; Health & Saf. Code, § 11352).[2] The order appealed from was made at the close of a hearing on a demurrer to the indictment by defendants Joseph and Ward and a motion made pursuant to Penal Code section 995[3] by all three defendants.

The superior court overruled the demurrers,[4] but granted the motions to dismiss the indictment on grounds that the immunity provisions of Health and Safety Code section 11367[5] applied to preclude prosecution of defendants for some, but not all,[6] of the overt acts and conduct on which the conspiracy charges were based, and that as to the remaining charges the competent evidence before the grand jury was insufficient to sustain the charges. Additionally, the court ruled that the extent of inadmissible matter presented to the grand jury was such that defendants had been denied due process making it impossible to simply consider the admissible evidence in order to determine its sufficiency.

The People contend that defendants are not immune from prosecution for conduct such as that on which the indictment is predicated and that the evidence before the grand jury was sufficient to support count I. They do not address themselves to the court's due process ruling,[7] and concede

---

[1]Subdivision 5 proscribes a conspiracy of two or more persons "To commit any act injurious to the public health, to public morals, or to pervert or obstruct justice, or the due administration of the laws."

[2]Subdivision 1 of Penal Code section 182, proscribes a conspiracy of two or more persons "To commit any crime." Health and Safety Code section 11352 makes it a felony offense if any persons "transports, imports into this state, sells, furnishes, administers, or gives away, or offers to transport, import into this state, sell, furnish, administer, or give away, or attempts to import into this state or transport" controlled substances, among which is heroin.

[3]Section 995: "The indictment or information must be set aside by the court in which the defendant is arraigned, upon his motion, in either of the following cases:
"If it be an indictment:
"1. Where it is not found, endorsed, and presented as prescribed in this code.
"2. That the defendant has been indicted without reasonable or probable cause."

[4]Defendants have not challenged the order overruling the demurrers.

[5]Section 11367: "All duly authorized peace officers, while investigating violations of this division in performance of their official duties, and any person working under their immediate direction, supervision or instruction, are immune from prosecution under this division."

[6]The court ruled that the conduct alleged as overt act No. 2 in count I, and all overt acts alleged in counts II and III, except overt act No. 2 in count II, were subject to the immunity statute.

[7]The People assert that the superior court did not base the dismissal of the indictment on due process grounds. The court's remarks prefatory to ordering dismissal suggest otherwise. After acknowledging the command of Penal Code section 939.6, that "the fact

that the evidence was insufficient to establish that the second overt act alleged in support of count II of the indictment was a conspiratorial act.

Before attempting to assess the People's contentions we shall summarize the overt acts alleged in support of each count of the indictment and, without regard to its admissibility, the testimonial evidence and other material presented to the grand jury.

Count I, charging the three defendants with a conspiracy to obstruct justice, alleged two overt acts—willful failure on December 4, 1974, to execute a warrant for the arrest of Melinda Spears, and arranging to furnish heroin to Spears under illegal circumstances on the same date.

Count II, charging defendants Joseph and Ward with conspiracy to furnish heroin, alleged three overt acts—furnishing heroin to Debbie Soria on six occasions between June 1975 and July 1975,[8] to Rosalie Squires on a single occasion in October 1974, and to William Martinez on five occasions between June 1973 and July 1973.

Count III, charging all three defendants with conspiracy to furnish heroin, alleged a single overt act by defendants Joseph and Ward and unindicted coconspirator Larry Oliver—furnishing heroin to Melinda Spears on eight occasions in December 1974.

that evidence which would have been excluded at trial was received by the grand jury does not render the indictment void where sufficient competent evidence to support the indictment was received by the grand jury," the court noted that a question of due process would nonetheless be "indicated, if it goes so far," and declared: "One can almost assume that the incompetent evidence received was so great in terms of volume and persuasion that there is no way to solve the situation by merely refusing to consider it." Then after finding merit in the sufficiency of the evidence and immunity claims, the court concluded: "So for all the reasons mentioned, the motion under Section 995 of each defendant is granted."

Even had the court not ruled on the due process claim, it would be appropriate for us to do so since it presents only a legal question. Proceedings would be further delayed and judicial resources wasted were we to return the matter to the superior court for such a ruling, after which the prevailing party or parties would again be entitled to seek appellate review of the ruling.

[8]The first date was either a clerical or other error and should have been June 1973. The People sought to amend the indictment at the close of the section 995 hearing. Defendants objected on grounds that resubmission to the grand jury was the only proper means by which to amend an indictment. The superior court took the motion under submission but did not rule on it. As will appear, the evidence before the grand jury was such that there is no reasonable possibility that defendants were misled by the error. Amendment is therefore unnecessary. (*People* v. *LaMarr* (1942) 20 Cal.2d 705, 711 [124 P.2d 77].)

Twelve witnesses appeared before the grand jury. In addition, the testimony given by Melinda Spears at a prior preliminary hearing conducted on a felony complaint charging defendants Joseph and Ward with furnishing heroin to Spears, was read to the grand jury. Witnesses Oliver, Squires, Soria, Garcia, Spears (at the prior hearing), and Martinez testified under grants of immunity. Witness Garcia was not sworn. Among the exhibits presented to the grand jury were the entire transcript of the preliminary hearing referred to above, and the prosecutor's original memorandum of law that had been submitted to the magistrate at the preliminary hearing.

COUNTS I AND III: IRWIN

Larry Irwin testified that defendants Joseph and Ward had been partners, working as narcotics detectives of the Salinas Police Department from the time of their promotion to that rank in July 1973. Defendant Backus, a sergeant in the same department, had been their immediate supervisor throughout the period in which the offenses allegedly were committed.

On the evening of December 4, 1974, Irwin, a Salinas Police Department detective, and his partner, Detective Oliver, arrested Melinda Spears in her hotel room and seized approximately 30 balloons of heroin as well as a packet of uncut heroin. Spears, a companion who had also been arrested in the hotel room, and the contraband, were taken to the detective division office at the police station. The heroin was weighed and tested by a police detective who returned it to Irwin. Irwin placed it in a cellophane bag on his desk. Shortly thereafter Backus, Ward, and Joseph looked at it, after which Irwin placed it in his desk which he locked.

Irwin testified that on the morning after the arrest Backus told Irwin to give the narcotics to him to be put "downstairs" or in the evidence room. When Irwin checked the contents of the cellophane bag before giving it to Backus, several of the balloons were missing, as was the packet of uncut heroin.

On the evening of the arrest, defendants asked Irwin if Spears was willing to turn in her supplier. Irwin told them that he believed she would do anything as she did not want to go to jail. He also told them that Spears had stated that she was a heroin addict.

At the request of the four officers, Spears telephoned her supplier, "Minnesota," in Pinole, ordered two or three ounces of heroin "puppies," and was told by Minnesota to come up the following day when he would have some "puppies." Irwin could not go to Pinole. Oliver was to go. Backus told Joseph to go, but would not authorize Ward to accompany them. Ward planned to take time off to go along.

Irwin overheard Ward, Joseph, and Oliver discuss a plan to have Joseph take Spears to his home for the night. Backus was not a participant in this discussion.

## OLIVER

Patrolman Oliver of the Salinas Police Department, who had been a detective and the partner of Irwin on December 4, 1974, testified that he had participated in the arrest of Spears. He knew her also as Sarah Taylor and Melinda Kincheloe (her maiden name), but the first name by which he had known her was Melinda Spears. His testimony regarding the arrest and seizure of the heroin paralleled that of Irwin.

Oliver also testified that on their arrival at the detective division with Spears, she had been turned over to Backus who interviewed her in the captain's office where she had "apparently" agreed to turn in her supplier. He could neither hear the conversation nor see what happened in the interview room. While the interview was in progress he ran a teletype warrant check on Spears and learned that she was wanted as a parole violator. He gave a copy of the teletype print-out with this information to Backus, pointing out to him that she was wanted. Backus either told Oliver to obtain the original print-out or said that he would get it himself. Originals were normally kept in a file basket. When asked if Backus had told him he wanted the original so that no one else would know Spears was wanted, Oliver replied: "Yeah, that was the reason for getting it."

Oliver testified that the contraband seized at the time of Spears' arrest was locked in his desk after being examined by Backus in the presence of Irwin, Oliver and possibly Spears. He did not think any of it was locked in Irwin's desk, but did not know. He thought the uncut heroin was among the items locked in his desk. Backus told him that evening that Spears was going to turn over her supplier.

Backus called Ward and Joseph into the case on the evening of the Spears arrest. With Oliver present, the four discussed the fact that Spears was addicted, a heavy user, and they would have to keep her in custody to be sure she would be available for the trip. Oliver did not know who indicated that it would not be advisable to put her in the jail (where her fingerprints would automatically be taken and sent to Washington, leading to others learning she was wanted). There was a collective decision that her wanted status should not be discovered. Backus talked about this the most and the others agreed.

The four also discussed placing Spears in the county hospital, but a 72-hour hold procedure for such commitments would make her unavailable for the meeting with her supplier. Placing her in a motel with a guard was ruled out because the City of Salinas would have to pay the cost of the motel room and the guard. It was decided that Joseph would keep Spears in custody in his own home.

Oliver did not recall a statement by any of the four regarding maintaining Spears on heroin, but testified that it was "understood by everybody without having to be actually said" that they would have to maintain her themselves with her own supply of heroin. The only statement in this regard that Oliver recalled was by Backus who said to Joseph, "you're not a rookie. Do what you have to do." Oliver saw Spears leave the police station with Joseph.

Oliver testified that he put the heroin in his desk drawer because he could not put it in the evidence room where it would be accounted for. Normally contraband was placed in the evidence room if an arrest related to its seizure had been made. Backus told Oliver that if Spears did not "perform satisfactorily" she would be arrested for possession of the contraband and it would then be put in the evidence room.

Before Oliver left the station on the night of the arrest, he took two of the balloons of heroin out of his desk and put them on a desk. No one asked him to do so. Spears was standing nearby. When he next saw her 12 hours later she did not exhibit withdrawal symptoms. Before leaving for Pinole on the afternoon of December 5, Oliver took six or eight more balloons from his desk. After Spears had made the buy from her source in Pinole about 2 or 3 a.m. on December 6, Joseph rented a motel room in Martinez. Spears, Joseph, Ward, and Oliver were all present when Oliver gave two more balloons to Spears who was becoming ill. She injected herself in the presence of the officers. Before Oliver left the motel

room that night he put two more balloons on a desk in the room. Joseph and Spears remained in the room.

Oliver gave Spears two more balloons on the night of December 6, after she had been released, and one on the next day. He did not recall what he did with the remaining balloons, if there had been more. He acknowledged that at a prior preliminary hearing he had testified that he had given two of the balloons to Joseph, and later testified that he had given the balloons to Joseph either before they left, or on the way to Pinole. Oliver destroyed the remainder of the heroin by flushing it down a toilet, after giving one balloon to Irwin for demonstration purposes and some of the uncut block to Backus.

## DELLFOUS

Salinas Police Instructor Dellfous testified that in the summer of 1975, after Ward and Joseph had resigned and court proceedings against them had begun, Dellfous said to Backus that he did not understand how the two could have been furnishing narcotics without Backus or a police captain being aware of their activity. Backus had responded, "I knew what they were doing."

## BUCKLEY

Terry Buckley, an employee of the California Department of Justice confirmed that the telecommunication center of the department had transmitted a reply to the Salinas inquiry regarding Spears on December 4, 1974. A department copy of that message was presented to the grand jury. Interpreting the symbols and abbreviations in the message, Buckley testified that the message advised Salinas that warrant No. N2049, issued September 5, 1974, was outstanding and sought the arrest of Spears.

## ARNOLD

California Department of Corrections records Officer Arnold testified that Melinda Spears had been released to Region Four of the Parole and Community Services Division in Santa Ana in May 1974, and had been assigned number 2049. Records of the department indicated that a warrant for her arrest had been issued on September 5, 1974, at the request of two members of the Narcotic Addict Evaluation Authority. Copies of the records on which this testimony was based were also presented to the grand jury.

BREILING

Oscar Breiling, a special agent of the Department of Justice, investigated charges of misconduct in the Salinas Police Department in response to a request by the Monterey County District Attorney. In early November 1975, he spoke with Joseph in Joseph's home, with Joseph's counsel present at Breiling's suggestion. Breiling admonished Joseph regarding his *Miranda* rights at the outset of this interview. On January 14, 1976, Joseph telephoned Breiling in the latter's San Francisco office. Joseph indicated he might obtain employment out of state and asked how the investigation was progressing. He asked whether the charges against him in the Spears case (which had been dismissed by the magistrate after the aforementioned preliminary hearing) might be refiled by the district attorney, and asked if he could leave the state.

Breiling told Joseph he would like to discuss the Spears matter with him, but was not going to "readmonish him," and did want Joseph to "think very carefully" before answering. In response to a question by Breiling, Joseph said that on the night of the Spears arrest he had spoken with Backus, Oliver, and Ward, outside Backus' office. Joseph told Backus that somebody would have to furnish heroin to Spears on the trip to Pinole. Joseph said that Backus appeared upset and replied: "Joseph, you're not a rookie. You know what has to be done. Go ahead and do it," or "words to that effect."

Joseph told Breiling that he was aware at that time that Spears was wanted, and that he, Backus, Ward, and Oliver had discussed her wanted status "extensively" that evening before deciding how they were going to house her. Joseph also told Breiling that they could not put Spears in the hospital or officially in jail where her wanted status would become known.

Breiling told Joseph that in an interview with an investigator Spears claimed Oliver, Ward, and Joseph returned to her 28 of the 30 balloons they had taken from her. Joseph "blew up" saying that was a lie, and said that he had discussed this with Ward and "they had decided . . . the most she possibly could have gotten back was eight balloons."

In a subsequent call, after Breiling had spoken to Joseph's attorney who advised Breiling that he had told Joseph that Joseph could talk to Breiling, Joseph said that he had a conversation with Spears and Backus prior to the Pinole trip. Joseph had asked what Spears' motivation was for

turning her connection in, and Backus had responded by pushing a copy of a teletype across the table, saying "that's her motivation." The teletype said that Spears was wanted by the Department of Corrections.

Joseph also told Breiling that he heard Backus direct someone to remove the original teletype so no one else in the department would know she was wanted.

SPEARS

Melinda Spears' preliminary hearing testimony was read to the grand jury,[9] with an admonition that it was to be considered only against Joseph and Ward.

Spears had testified that she had been arrested on December 4, 1974, by Oliver and Irwin. She had in her possession 30 half-spoons of heroin and a half-piece of uncut heroin. The officers who took the heroin from her took it to the police station. At the station Joseph, Ward, Oliver, Frank Bernardisci, and Scott were present during a conversation about her "connection." She offered to give him up. Joseph and Ward told her she would not do any time if she did. She was not booked or charged in connection with the heroin possessed at the time of her arrest.

The heroin taken in the arrest was put on the table in front of Backus. Before she left the station she discussed her heroin use with Joseph alone, telling him she was going to be sick. He told her he would take care of it. After they left the station he gave her some heroin. She injected it in his presence in the room at the hotel in which she had been arrested. They had returned to the room to get her "outfit" for the injection. The two balloons and contents given to her by Joseph were identical to those

---

[9]To show on the record that Spears was unavailable and the evidence admissible under Evidence Code section 1291, the testimony of Robert Taylor, supervising investigator for the district attorney's office, was presented. He testified that he had investigated the charges against Ward and Joseph after learning of them in mid-1975. Initially he had worked with Backus and Captain Rodman. He had interviewed Spears and had arranged her transportation from the California Rehabilitation Center to Salinas twice, in September and October 1975. He had remained in contact with her until shortly after her release from CRC in January 1976. She gave him her address and that of her father and agreed to advise him of any change. She later called him from her father's home. When he called that home in March 1976, he first learned that she was not there. Her father did not know her whereabouts. The man with whom Spears had been arrested had gone to Alaska on his release in December 1975. Taylor confirmed, through the cooperation of Alaska state police, that Spears had been in Alaska, but learned this only four days before the grand jury hearing commenced. She was then being sought by Alaska officials for questioning, and her whereabouts were again unknown.

seized from her earlier in the day. She had cut and packaged that heroin herself.

The next morning at his home, Joseph gave her two more balloons which she injected there before returning to the police station. She remained at the station until she, Joseph, Ward, and Oliver left for Pinole. About 10 miles north of Salinas, while the car was stopped at a service station, Joseph gave her more heroin which she injected in the rest room.

After the arrest in Pinole, in the car on the way to a motel room rented by Joseph, Oliver gave two more balloons to Ward or Joseph to give to Spears. Joseph asked her if Oliver could watch her "fix" because he had never seen anyone do it. Joseph gave her the two balloons when they went into the motel room. Joseph, Ward, and Oliver were present when she injected herself. The next morning Joseph gave her more heroin when he saw she was sick. He told her that morning that she would not receive any more until they returned to Salinas because there wasn't any more.

That evening, December 6, at the Salinas police station, Joseph gave Spears two more balloons of heroin for use that night and two additional balloons for the next morning.

On the night of December 7, Ward gave her two balloons of heroin. On the morning of December 8, Joseph gave her two balloons at his home, and Ward gave her two at the police station in the evening. On December 9, Joseph gave her one bag at his home, and on December 10 she entered a drug rehabilitation program pursuant to arrangements made by Joseph. After she started the program she received heroin on two occasions from Oliver. She received no more heroin from any Salinas police officer and left that city about three weeks after entering the program.

On cross-examination, Spears had testified that Oliver and Irwin took her into Backus' office after her arrest and put the seized contraband on the desk before Backus. Ward was not present at that time. Backus told Spears that he had discovered through a warrant check that she was wanted. She agreed to turn in her supplier, and in return Backus told her that he would see that no charges were filed on the heroin possession. She did not recall any statement by Backus that he would not report her presence to the authorities who wanted her. Ward was not present during any of this conversation.

Backus asked Spears how much heroin she was using each day and she told him. (Six balloons.)

## COUNT II: SQUIRES

Rosalie Squires testified that in the fall of 1974, she was addicted to heroin and was using one-quarter to one-half spoon daily. She knew Joseph and Ward who had arrested her brother that summer and had warned her to stop dealing. Her husband had been arrested for a burglary.

She met with Joseph in late October or early November at Joseph's request. Joseph told her that if she helped him recover property stolen by her husband in the burglary no charges would be pressed. While they were together in a car returning to Salinas with the recovered property, Joseph took a condom from his shirt pocket and displayed it to her. It appeared to contain at least one-half ounce of heroin. She jokingly asked him to turn her on. She was not asking for the heroin in return for assisting in the recovery of stolen property. Joseph replied that he might lose his job if anyone found out. She did ask him once more, however, and later Joseph gave her some of the heroin. She did not know why he gave it to her, but since he had often made suggestive remarks to her, possibly he hoped she would be receptive. As he gave her the heroin, Joseph asked "when are we going to get together?"

## SORIA

Debra Soria, a California Rehabilitation Center patient, had been in a residential drug treatment program in July 1973. She had been addicted to heroin at that time. She left the San Jose treatment facility in July 1973 and went to Salinas where she met Ward and Joseph. She was 17 years old and was attempting to earn money by prostitution when the two officers approached her in a "narc" car. They told her they would not arrest her on an outstanding warrant if she helped them. She agreed. The officers took her to the home of a friend of Soria, and gave her money with which to buy drugs. She purchased two quarter-spoons for $30. That evening she injected the heroin using an "outfit" given to her by Ward and Joseph. Joseph helped her tie off her arm in preparation for the injection. She gave herself the injection in the police car, parked behind the police station, after Joseph had gone into the station to get the "outfit."

During the summer of 1975, Soria met Ward at his request. He told her he wanted to recover guns that had been stolen from the district attorney's office. He gave her two "quarters" of heroin in a single balloon. She estimated that Ward and Joseph, "either or both of them," had furnished her with heroin at least seven or eight times in exchange for information. On one occasion, Ward and Joseph drove her to a camp where, with money supplied by Joseph, she purchased heroin that she was then permitted to keep after it had been inspected by Joseph. The officers sometimes gave her money, but told her they preferred to give her heroin since the money "was coming from their own pocket."

Only once did Ward give Soria heroin directly. Joseph was not with him on that occasion. The two officers were together on each of the other occasions and had discussed the fact that they were going to give her heroin. She had never asked for it, and on one occasion when she had just left a drug center, she was not sure what she really wanted. They told her she might as well take it because they wanted her to help them out and they would help her—that she did not have to worry about being arrested anymore, and no one on the police force would bother her.

GARCIA

Danny Garcia would not promise to answer questions 'truthfully, stating: "Depends on what the question is." He agreed to have the prosecutor ask him each time a question was asked whether or not he was going to tell the truth. He said he would not testify regarding facts he had testified to at the preliminary hearing because after that testimony, he had been "hassled a lot." He was in custody at the California Rehabilitation Center after revocation of probation granted on a conviction of escape from the county jail.

Garcia said his testimony at the preliminary hearing had not been true, and then said that this statement was not true. He said he did not know the truth "about the question of whether or not you were furnished heroin by Mr. Joseph and Mr. Ward." He did not remember being furnished by either. He did not think it was possible. He had testified at the preliminary hearing that Ward gave him heroin at the police station. That was not the truth. Neither Ward nor Joseph had ever given him heroin. That was the truth.

## Martinez

William Martinez testified that in the summer of 1973, he was twenty-one years old and then had been addicted to heroin for seven or eight years. He was arrested by sheriff's officers for possession of narcotics paraphernalia and agreed to "exchange information." He was an informant for the sheriff's office. A sheriff's detective introduced him to Joseph and Ward. They gave him narcotics when he told them he could not work for them because he had no time—he was "hustling" to get money. Both were present with him in an undercover narcotics car in a parking garage on the first occasion on which the pair gave him heroin. Ward loaned him an outfit with which he injected himself in the car. He gave the outfit back to Ward. On the next occasion he was given heroin in the police station on his promise to "make it up to you on some other things." Later that day he "set up" the arrest of an acquaintance. Joseph and Ward made the arrest and again at the police station gave Martinez part of the heroin they had seized in the arrestee's hotel room. On a third occasion, at the direction of Ward and Joseph, Martinez arranged a buy in which he introduced another undercover agent to a heroin seller who had offered him an ounce of heroin. The seller was arrested by Ward and Joseph. Later, at the station the two officers showed Martinez heroin they had taken from the seller and gave part of it to Martinez. Martinez then told them that the seller's wife kept the heroin supply in her home. The officers drove Martinez to the home, and he was able to convince the seller's wife to give him the heroin to hold since the police might come. She gave Martinez 15 to 20 balloons which he kept. The officers did not ask him for it. These activities occurred during the period between the summer of 1973 and early 1974.

## Rodman

Captain Rodman, in charge of the detective division of the Salinas Police Department, testified that the division had money budgeted to pay informants and to buy narcotics. He testified that detectives did not have to pay informants with their own money, and that Ward and Joseph had from $250 to $1,000 of division money in their possession at any given time while acting as narcotics detectives. Rodman knew of no other incidents in any jurisdiction in which a law enforcement officer supplied heroin in return for information.

In addition to the foregoing testimony the grand jury was given the preliminary hearing transcript mentioned above. The grand jury was not

instructed regarding the limitations on admissibility of statements of coconspirators implicating persons other than themselves, and no instructions were given regarding the grand jury's consideration of the transcript of the preliminary hearing. The grand jury was, however, instructed by the prosecutor to consider the magistrate's remarks concerning the immunity section as well as the memorandum of law on that question which the prosecutor had submitted to the magistrate.

I

## IMMUNITY

We consider first the People's contention that the superior court erred in holding that the immunity provided by Health and Safety Code section 11367, precludes prosecution of defendants for some or all of the offenses charged in the indictment. The People argue both that the activities of the defendants set forth as overt acts in support of the various conspiracy counts were not undertaken in performance of the defendants' official duties within the meaning of section 11367, and that in any case this question is one of fact to be resolved by the jury which may not be decided as a matter of law by a court ruling on a motion to dismiss.

The People's reliance on *People* v. *Superior Court (Biggs)* (1971) 19 Cal.App.3d 522, 533 [97 Cal.Rptr. 118], for the latter proposition is misplaced. *Biggs* did not hold that the question of immunity could never be decided by the court as a matter of law. The only mention of the immunity afforded by section 11710, the predecessor to section 11367, was made in connection with the defendant's possible need to discover privileged official records pursuant to Evidence Code section 1040. In that context the court stated that "a statutory immunity was available to him, could he but convince the jury that he had been working under immediate direction of the authorities." Although there are situations in which the claim that a defendant was working under the direction of a peace officer or was a peace officer performing his official duties must be raised as a defense at trial (see e.g., *People* v. *Jones* (1962) 200 Cal.App.2d 805 [19 Cal.Rptr. 797]), it does not follow that the questions cannot in other cases be resolved as a matter of law solely on the evidence presented by the People at a preliminary hearing or before the grand jury. Indeed, to hold otherwise would be contrary to the express language of section 11367 which provides that such persons "are immune from prosecution under this division."

We recognized the jurisdictional nature of a statutory grant of immunity in *People* v. *King* (1967) 66 Cal.2d 633, 644-645 [58 Cal.Rptr. 571, 427 P.2d 171]. There, defendant's motion to dismiss an indictment had been denied, and he thereafter moved to dismiss the indictment on grounds that he was entitled to the immunity from prosecution granted by Insurance Code section 12924, having earlier given compelled self-incriminatory testimony regarding the transaction for which he was being prosecuted. In order to effectuate the grant of immunity we recognized the propriety of that procedure, explaining: "Although it has been stated that Penal Code section 995 provides the only grounds upon which an indictment may be set aside [citations], a statutory grant of immunity enjoins the prosecution of a criminal action and thus deprives the court of jurisdiction to proceed. [Citation.] Accordingly, an immunity statute cannot be given its proper effect unless it too is recognized as a proper basis for quashing an indictment." ■ It follows that if statutory immunity is established as a matter of law on the basis of evidence presented at a grand jury hearing, the defendant has not been legally committed to stand trial, and dismissal of the indictment on a motion pursuant to Penal Code section 995 is also proper.

We next examine the language and purpose of section 11367 to determine whether the immunity provided therein extends to the actions of these defendants as charged in the overt acts alleged in support of the three conspiracy counts. The parties do not question that the immunity "from prosecution under this division" of the Health and Safety Code extends to prosecutions for conspiracy under Penal Code section 182, subdivision 1, if the offense which is the object of the conspiracy is one within division 10 of the Health and Safety Code. Count I of the indictment, however, charges a conspiracy to obstruct justice, a violation of subdivision 5 of Penal Code section 182 itself. The first overt act relied upon by the People in support of that charge is the failure to execute an arrest warrant issued by another jurisdiction which sought the return of Spears as a parole violator.

■ "[A] statute giving immunity in one class of offenses cannot apply or be used to give immunity in an investigation concerning another and different class." (*In re Critchlow* (1938) 11 Cal.2d 751, 758 [81 P.2d 966].) Since this count does not charge an offense under division 10 of the Health and Safety Code, it is not within the immunity granted by section 11367.

■ Similarly, the evidence presented to the grand jury in support of the second overt act charged in support of count II, furnishing heroin to

Squires, did not show as a matter of law that the acts involved were related in any way to the investigation of violations of division 10. Thus, this overt act is not one subject to the immunity provision.[10]

■ As our conclusions regarding count I and the second overt act charged in count II recognize, the immunity granted by section 11367 is not a license to peace officers to commit any and all otherwise unlawful acts[11] in the pursuit of narcotics law enforcement objectives. Rather, this immunity reflects a legislative recognition that the investigation of suspected narcotics violations often necessitates the employment of undercover agents and persons secretly working under their direction who must pose as addicts, users, or sellers, and in so doing may be required to commit acts which would otherwise violate division 10 by possessing, furnishing, selling, or transporting controlled substances.[12]

The remaining acts charged as overt acts in support of counts II and III are all violations of Health and Safety Code section 11352, furnishing narcotics.[13] The People argue that notwithstanding this indisputable fact, the Legislature did not intend to immunize police officers "for injecting heroin into the veins of their addicted tools," or in circumstances in

[10]The People concede, however, that the second overt act charged is not supported by evidence sufficient to establish probable cause to believe it was done in furtherance of a conspiracy rather than an individual act by defendant Joseph.

[11]*People* v. *Sipress* (1975) 51 Cal.App.3d 98, 102 [123 Cal.Rptr. 884], relied on by respondents for the proposition that section 11367 affords immunity for "all activity" during the investigation of a narcotics offense, is not contrary. The court there merely posited a hypothetical "assuming that the immunity covered all activity" of that particular defendant. The opinion does not indicate that this activity might have involved offenses other than division 10 offenses. That the immunity from prosecution is limited to offenses specified by the statute was recognized in *People* v. *Brocklehurst* (1971) 14 Cal.App.3d 473, 477 [92 Cal.Rptr. 340].

[12]Shortly after the enactment of Health and Safety Code section 11710, the predecessor to section 11367, this necessity was formally acknowledged in the Report of the Citizens Advisory Committee to the Attorney General on Crime Prevention (Mar. 26, 1954), which stated with regard to proof of sale: "Except in rare instances, convictions are impossible unless the testimony of the purchaser can be secured. Since the usual addict is concerned with protecting his own sources of supply, he is not a willing or satisfactory witness. Consequently, the enforcement agencies are forced into an elaborate, costly and time-consuming process of arranging for sales to their own officers. In the absence of such devices, the offense of selling is usually reduced for prosecution and conviction to that of mere possession." (Pp. 29-30.)

In 1961 the Final Report of the Special Study Commission on Narcotics noted that "almost all prosecutions in California for the sale of narcotics involve a sale to a law enforcement officer operating undercover as a user or peddler of narcotics." (P. 42.)

[13]Section 11352 provides in pertinent part: ". . . every person who . . . furnishes, administers, or gives away . . . any controlled substance specified in subdivision (b) or (c) of Section 11054 . . . shall be punished by imprisonment . . . ." Heroin is listed as item "(10)" in subdivision (c) of section 11054.

which the officers' conduct was "corrupt." ▮ Ignoring the hyperbole, for there is no indication in the record that defendants literally injected heroin into anyone, we are compelled in this instance as in all others in which interpretation of a statute is at issue, to consider first the plain language of the enactment, according a criminal defendant the benefit of the construction most favorable to him if the statute is susceptible of more than one interpretation. (*People* v. *King* (1978) 22 Cal.3d 12, 23 [148 Cal.Rptr. 409, 582 P.2d 1000].) Thus, neither our personal revulsion at the methods by which defendants conducted their narcotics "investigations," nor a belief that the methods were so "corrupt" that the defendants must have known they were "wrong," as the People suggest, is relevant to ascertaining the extent of the immunity afforded by the statute in question. Therefore, since "furnishing" narcotics is an offense within the scope of the immunity grant, absent facts to show that the officer was not acting in the performance of his official duties in furnishing the heroin, the immunity afforded by section 11367 attaches.

▮ Defendants argue that the evidence before the grand jury establishes as a matter of law that they are immune from prosecution. That argument necessarily includes an assertion that they were engaged in performance of their official duties, and thus not acting in excess of their authority in the manner in which they furnished heroin to the recipients named in the remaining overt acts. If, however, defendants' method of furnishing heroin to their informants and agents violated provisions of law other than the penal provisions of division 10 of the Health and Safety Code, their actions were unauthorized and they were not performing their official duties. (Cf. *People* v. *Curtis* (1969) 70 Cal.2d 347, 354 [74 Cal.Rptr. 713, 450 P.2d 33] [unlawful arrest not performance officer's official duty].)

Here the evidence before the grand jury in support of the overt acts alleged in counts II and III precludes any holding that, as a matter of law, defendants were engaged in the performance of their official duties when they furnished heroin to the named recipients. As we have noted above, section 11367 provides that peace officers are "immune from prosecution" under division 10. Neither that section nor any other provision of law exempts peace officers from compliance with other provisions of division 10. The heroin furnished to Spears was seized from her in conjunction with her arrest. The source of the heroin given to Soria by defendants Ward and Joseph is not revealed by the evidence before the grand jury. The evidence as to Martinez shows that the defendants on one occasion gave him heroin from an unknown source, and on two other

occasions gave him heroin which they asserted had been seized in conjunction with the arrests of other persons.

 Health and Safety Code sections 11474 and 11474.5 mandate the disposition of controlled substances seized by peace officers. Section 11474 directs: "All seizures under provisions of this chapter . . . shall, upon conviction of the owner or defendant, be ordered destroyed by the judge of the court in which conviction was had and the judge shall turn all such evidence over to the Attorney General for destruction or disposition."[14] Defendants had no authority to otherwise dispose of any heroin seized from a person against whom charges related to possession of the heroin were contemplated or filed. Nor could they claim to reasonably believe that any part of such seized evidence could be diverted to their investigatory activities. Due process requires that criminal defendants have an opportunity to examine, and in appropriate cases have chemical tests performed on, evidence to be offered against them. (*In re Newbern* (1959) 175 Cal.App.2d 862 [1 Cal.Rptr. 80, 78 A.L.R.2d 901].)[15] It is not within the province of police officers to independently determine whether seized evidence might be favorable to a defendant, in which case intentional suppression or destruction denies due process. (*Giglio* v. *United States* (1971) 405 U.S. 150, 153-154 [31 L.Ed.2d 104, 108-109, 92 S.Ct. 763]; *Brady* v. *Maryland* (1963) 373 U.S. 83, 87 [10 L.Ed.2d 215, 218, 83 S.Ct. 1194]; *People* v. *Hitch* (1974) 12 Cal.3d 641, 645-646 [117 Cal.Rptr. 9, 527 P.2d 361].)

 Even when no prosecution results from a seizure, peace officers are under an obligation to dispose of seized contraband according to law. Health and Safety Code section 11474.5 directs: "All seizures of controlled substances . . . which are in possession of any city, county, or state official as the result of a case in which no trial was had or in a case which has been disposed of by way of dismissal or otherwise than by way of conviction, shall be turned over to the Attorney General for destruc- tion or disposition under order of the court."

[14]Section 11486 further emphasizes this duty: "When controlled substances have been seized pursuant to this division and the case has been disposed of by way of dismissal or otherwise than by way of conviction, they shall by order of the court, be turned over to the Attorney General unless the court finds that the controlled substances were lawfully possessed by the defendant."

[15]This right is expressly recognized in Health and Safety Code section 11479, which permits destruction of seized controlled substances in excess of 10 pounds by a publicly operated criminalistic laboratory after analysis, but only after the defendant has been given notice and an opportunity to request that samples be taken from the substance prior to its destruction.

The legislative intent that controlled substances seized by peace officers not be dissipated or find their way back into the hands of persons not authorized to possess them is further demonstrated by the requirement of section 11485 that they be turned over to the Attorney General for safekeeping pending prosecution of a defendant who is a fugitive.

Although the Legislature has not expressly included provisions for disposition of controlled substances purchased by peace officers or their agents, it is manifest that the disposition requirements apply to these substances also. Any controlled substance purchased by a peace officer or his agent is potentially evidence to be preserved for use in a prosecution of the seller. The comprehensive legislative scheme for disposition of controlled substances held for and used in criminal prosecutions does not admit of an interpretation which excepts controlled substances which are purchased rather than literally "seized" from suspects. This conclusion is compelled by section 11470 which provides at the outset of chapter 8 of division 10, governing seizure and disposition of controlled substances, that "all controlled substances which have been manufactured, distributed, dispensed or acquired in violation of this division" are "subject to forfeiture." Thus, we conclude that the Legislature did not intend, and a peace officer could not reasonably believe that he was authorized to dispose of controlled substances, or any portion thereof, which he or his agents on his behalf have acquired by any method other than those provided in chapter 8.

In their failure to comply with the statutory provisions governing disposition of the heroin they seized and purchased, defendants acted outside the scope of their duties as peace officers. As to the overt acts charged in support of counts II and III of the indictment, therefore, the evidence before the grand jury does not establish as a matter of law that defendants were acting in performance of their official duties when they supplied heroin to the named recipients. The court erred in ruling that the immunity afforded by section 11367 precludes prosecution on those counts.

II

SUFFICIENCY OF THE EVIDENCE

Having concluded that defendants are not immune from prosecution on any of the three counts of the indictment, we turn to the People's contention that the superior court also erred in holding that the evidence

presented to the grand jury was not sufficient to establish reasonable or probable cause to indict on count I. (Pen. Code, § 995.)

Defendants Joseph and Backus, in their motion to dismiss the indictment, challenged the sufficiency of the evidence as to all counts. The superior court, having concluded that immunity applied, did not rule on the claim. Therefore, we shall briefly consider the sufficiency of the evidence as to counts II and III also.

Defendant Joseph claimed in his motion to dismiss that the evidence before the grand jury as to count I established that Spears had been arrested on December 4, 1974, by Officer Irwin. He further argued that because a person may be committed to the California Rehabilitation Center upon commission of a misdemeanor, the evidence was inadequate to demonstrate that defendants had knowledge that the warrant issued by the Narcotic Addict Evaluation Authority was a felony warrant. Absent such knowledge, Joseph argued, willful failure to execute that warrant was not shown since it was received in the nighttime, and was not endorsed for nighttime service as is required in the case of arrests on misdemeanor warrants. We need not decide whether the warrant was a misdemeanor warrant. Penal Code section 840 provided at the time of the offense: "An arrest for the commission of a misdemeanor or an infraction cannot be made between the hours of 10 o'clock p.m. of any day and 7 o'clock a.m. of the succeeding day, unless . . . (3) The arrest is made when the person is in custody pursuant to another lawful arrest . . . ." Not only was the warrant that was to be executed one for apprehension of a parole violator rather than a misdemeanant, but Spears was in custody pursuant to the lawful arrest for possession of heroin at the time defendants learned of the outstanding parole violator warrant.

No claim was made with regard to the admissibility of the evidence offered in support of the first count. That evidence showed that Joseph, Backus, and Ward each knew of the existence of the parole violator warrant for Spears, knew she was the person named in the warrant, and none of them acted to formally arrest and book her on the warrant. It also showed that Backus removed the original and file copies of the teletype warrant from the file where other officers might have learned from it that another jurisdiction wanted Spears.

■ The offense of conspiracy to pervert or obstruct justice, or the due administration of the laws, defined in Penal Code section 182, subdivision 5, "includes both malfeasance and nonfeasance by an officer in connec-

tion with the administration of his public duties, and also anything done by a person in hindering or obstructing an officer in the performance of his official obligations." (*Lorenson* v. *Superior Court* (1950) 35 Cal.2d 49, 59 [216 P.2d 859].) In *Lorenson* this court recognized that "[a] conspiracy with or among public officials not to perform their official duty to enforce criminal laws is an obstruction of justice . . . . In the same category is a conspiracy to obtain the release of a person charged with a felony by presenting a worthless and void bail bond . . . ." (*Id.,* at pp. 59-60.) ▮ We have no difficulty in also recognizing that a conspiracy among police officers not to execute a warrant of another jurisdiction for the arrest of a person in their custody, and the concealment of the existence of the warrant from other officers, is both malfeasance and nonfeasance of their duties and constitutes a conspiracy to obstruct justice within the above definition. The evidence before the grand jury was sufficient to establish probable cause to believe that such a conspiracy existed among defendants Joseph, Backus, and Ward. ▮ "Probable cause is shown if a man of ordinary caution or prudence could entertain a strong suspicion of guilt of the accused, and if some rational ground exists for an assumption of guilt the indictment will not be set aside." (*Cotton* v. *Superior Court* (1961) 56 Cal.2d 459, 462 [15 Cal.Rptr. 65, 364 P.2d 241].)

Joseph claimed first, with respect to counts II and III, that the preliminary hearing testimony of Spears was not competent admissible evidence inasmuch as the People had not shown the requisite diligence in attempting to locate her and procure her attendance before the grand jury.

"The grand jury shall receive none but evidence that would be admissible over objection at the trial of a criminal action, but the fact that evidence which would have been excluded at trial was received by the grand jury does not render the indictment void where sufficient competent evidence to support the indictment was received by the grand jury." (Pen. Code, § 939.6, subd. (b).) ▮ An indictment based solely on hearsay or otherwise incompetent evidence is unauthorized and must be set aside on motion under Penal Code section 995. (*People* v. *Anderson* (1968) 70 Cal.2d 15, 22 [73 Cal.Rptr. 550, 447 P.2d 942]; *Rogers* v. *Superior Court* (1955) 46 Cal.2d 3, 8 [291 P.2d 929].)

The prior testimony of Melinda Spears was hearsay, admissible only if she was unavailable. (Evid. Code, § 1291.) ▮ In order to satisfy the statutory and constitutional requirements which permit this exception to the hearsay rule and the Sixth and Fourteenth Amendment right to

confrontation and cross-examination the People must demonstrate diligence in attempting to procure the attendance of the witness. (*Barber* v. *Page* (1968) 390 U.S. 719, 724-725 [20 L.Ed.2d 255, 259-260, 88 S.Ct. 1318]; *Pointer* v. *Texas* (1965) 380 U.S. 400, 405 [13 L.Ed.2d 923, 925, 85 S.Ct. 1065]; *People* v. *Enriquez* (1977) 19 Cal.3d 221, 235 [137 Cal.Rptr. 171, 561 P.2d 261].) When an objection to the admission of prior testimony is made and heard at trial the question of " '[w]hether due diligence has been shown is a factual question to be determined according to the circumstances of each case. [Citation.] Unless there has been an abuse of discretion the ruling of the trial judge will not be disturbed.' " (*People* v. *Williams* (1973) 9 Cal.3d 24, 35 [106 Cal.Rptr. 622, 506 P.2d 998].)

Our conclusion here, based solely on the People's ex parte showing before the grand jury, that due diligence was shown (see fn. 9, *ante*) and that the prior testimony of Melinda Spears was admissible, does not preclude reconsideration of the question by the trial court should the People seek to introduce this evidence at trial over proper objection by defendants. At that time defendants will have an opportunity to cross-examine the People's witnesses and present evidence of their own which may lead the trial court to a contrary conclusion. (Cf. *People* v. *Prewitt* (1959) 52 Cal.2d 330, 335 [341 P.2d 1].)

Defendant Joseph further contended in his motion to dismiss the indictment that the preliminary hearing transcript itself and the prosecutor's memorandum of law submitted to the magistrate at that hearing were inadmissible. The People do not contend otherwise. Neither may be considered in determining the sufficiency of the evidence to support the indictment.

Finally, Joseph contended that the testimony of Oscar Breiling regarding admissions of Joseph made during the telephone conversation of January 14, 1976, were inadmissible in that they were obtained in violation of his Fifth Amendment right against self-incrimination. The People have addressed this claim as one based on an improper custodial interrogation in violation of Joseph's rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], pointing out that Joseph was not in custody and was many miles from the location of his interrogator, Breiling. The basis for the contention was, however, an assertion that Breiling violated Joseph's right to counsel by questioning him to elicit incriminating statements in the absence of counsel and without permission of counsel to do so. Thus the claim was

based on rights enunciated not in *Miranda,* but in *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199].

██ We conclude that this evidence was properly presented to the grand jury. The record does not suggest that any criminal charges were pending against Joseph at the time of the conversation. Although they may have been contemplated, and Joseph was represented by counsel, no adversary proceedings had been initiated at that time. Counsel had given permission generally for Breiling to speak with Joseph, and Breiling had reminded Joseph of the *Miranda*-based admonitions that had been given to him in the past. Under these circumstances no *Miranda* or *Massiah* violation occurred. (*People* v. *Duck Wong* (1976) 18 Cal.3d 178 [133 Cal.Rptr. 511, 555 P.2d 297].) Therefore, we need not consider whether the consent given by counsel was sufficiently broad to encompass the type of questions asked of Joseph by Breiling.

Defendant Backus claimed in support of his argument in the motion to dismiss the indictment that the evidence before the grand jury was insufficient as to him on count I because the warrant for the arrest of Melinda Spears was not a legal warrant, because the evidence demonstrated that the decision not to arrest Spears was his individual decision, and because no conspiratorial intent to pervert justice was shown.

In support of his challenge to the warrant Backus contends that it did not meet the requirements for a telegraphic warrant set out in Penal Code section 850.[16] This claim appears to be based on an assumption that the warrant itself was not before the grand jury and that only the testimonial evidence regarding its contents may be considered. However, the record demonstrates that a copy of the taped printout advising of the existence of and abstracting the warrant was presented to the grand jury. The claim also assumes that all of the items specified in section 850 must be included in the warrant even if, because it is a fugitive warrant for a parole violator, some, such as the amount of bail and nature of the offense, are irrelevant, and on the assumption that the warrant might be considered a misdemeanor warrant which had to be endorsed for night service.

---

[16]Section 850, authorizing transmittal of telegraphic copies of warrants or abstracts by telegraph, teletype, or other electronic devices provides that the warrant or abstract thereof "shall contain the following information: the warrant number, the charge, the court or agency of issuance, the subject's name, address and description, the bail, the name of the issuing magistrate or authority, and if the offense charged is a misdemeanor, whether the warrant has been certified for night service."

Backus' claim that the evidence showed only an individual decision on his part not to execute the warrant overlooks the testimony of Oliver that there was a collective decision not to book Spears on the arrest for heroin possession because the process would lead to others learning of her wanted status, and Breiling's testimony regarding Joseph's admission that he, Ward, and Backus had discussed the problem of housing Spears so as to avoid having that status discovered. Although Breiling's testimony regarding Joseph's statement was not admissible against Backus, the grand jury could consider it in determining whether any person other than Backus had participated in the plan to avoid arresting Spears on the parole violator warrant. This evidence, with that offered by Irwin that he overheard the conversation among Ward, Joseph, and Oliver discussing the plan to have Spears stay overnight in Joseph's home, was sufficient evidence from which the grand jury could infer the existence of an agreement. ▇▇ "Direct proof of a formal understanding between parties to the conspiracy is not required as the basis of an indictment or information . . . . The extent of the assent of minds which are involved in a conspiracy may be, and from the secrecy of the crime usually must be, inferred by the jury from the proofs of the facts and circumstances which, when taken together, apparently indicate that they are parts to the same complete whole." (*Lorenson* v. *Superior Court, supra,* 35 Cal.2d 49, 57-58.)

▇▇ Conspiracy is a specific intent crime, with the intent divided into two elements: "(a) the intent to agree or conspire, and (b) the intent to commit the offense which is the object of the conspiracy. . . . To sustain a conviction for conspiracy to commit a particular offense, the prosecution must show not only that the conspirators intended to agree but also that they intended to commit the elements of the offense." (*People* v. *Horn* (1974) 12 Cal.3d 290, 296 [115 Cal.Rptr. 516, 524 P.2d 1300].) ▇▇ When the offense is conspiracy to obstruct justice, as described in subdivision 5 of section 182, however, rather than conspiracy to commit "any crime" within subdivision 1 of that section, it is unnecessary to demonstrate an intent to "obstruct justice" as such. Rather, it is sufficient that the evidence shows an intent to do the acts constituting the elements of an obstruction of justice as they are described in the charging allegations of the accusatory pleading. (See e.g., *People* v. *Santens* (1961) 198 Cal.App.2d 592 [18 Cal.Rptr. 115].)

▇▇ Backus finally claimed, with regard to the sufficiency of the evidence, that there was not sufficient evidence before the grand jury to implicate him in a conspiracy to furnish heroin to Spears as charged in count III. We disagree. There was evidence, apart from Spears' prelimi-

nary hearing testimony which was not admissible against Backus, from which the grand jury could find that Backus knew that Spears was heavily addicted and that he recognized that she could not assist the officers in the plan to arrest her supplier if she became ill as the result of withdrawal from heroin. The grand jury could infer from the evidence that Backus, in telling Joseph to "do what you have to do," approved in advance furnishing heroin to Spears if that became necessary.

■. A reviewing court may not substitute its judgment for that of the grand jury or magistrate in determining the sufficiency of the evidence and must draw all reasonable inferences in support of the indictment or information. (*Williams* v. *Superior Court* (1969) 71 Cal.2d 1144, 1148 [80 Cal.Rptr. 747, 81 Cal.Rptr. 761, 458 P.2d 987]; *Lorenson* v. *Superior Court, supra,* 35 Cal.2d 49; *People* v. *Aday* (1964) 226 Cal.App.2d 520 [38 Cal.Rptr. 199].)

Defendant Ward did not submit a written memorandum of points and authorities in support of his motion to dismiss the indictment. At the hearing on the defendants' motions to dismiss Ward argued that the extent of the inadmissible evidence presented to the grand jury, and the failure of the prosecutor to advise the grand jury that certain evidence admissible against Joseph was not admissible against him, denied him (Ward) due process to such an extent that the indictment should be dismissed. He also asked that the immunity issue, raised in his demurrer to the indictment, be considered under the motion to dismiss.

Since the People have not included a copy of the motion itself in the record on appeal, and the superior court ruled the evidence insufficient as to all defendants as to count I, we assume that Ward's motion was made in part on the ground that the evidence did not show reasonable or probable cause to indict. As noted earlier, the People concede that the evidence is insufficient to suggest that Joseph's act in supplying heroin to Squires was pursuant to a conspiracy. The evidence that Ward furnished heroin to Soria and Martinez, admissible against both defendants, was sufficient, however, to support count II of the indictment.

### III

### DUE PROCESS

Defendants Backus and Ward each contended that the indictment should be dismissed because the extent of the inadmissible evidence before the grand jury was so great that the indictment was handed down

in violation of their right to due process of law. All three defendants adopted the due process argument made by counsel for Ward at the hearing on the motion to dismiss.

Neither this court nor the United States Supreme Court has yet addressed the question of a defendant's right to due process during grand jury proceedings (cf. *Beck* v. *Washington* (1962) 369 U.S. 541, 546 [8 L.Ed.2d 98, 105, 82 S.Ct. 955]), although some lower courts have assumed "arguendo" that grand jury proceedings must comport with due process. (See e.g., *United States* ex rel. *Curtis* v. *Warden of Green Haven Pris.* (2d Cir. 1972) 463 F.2d 84, 87.) This court, too, has assumed, but heretofore found it unnecessary to decide, that grand jury indictment procedures must comport with the demands of the due process clauses of both the federal and state Constitutions. (*Hawkins* v. *Superior Court* (1978) 22 Cal.3d 584, 586-587 [150 Cal.Rptr. 435, 586 P.2d 916].) In his opinion for the Court of Appeal, vacated by our grant of a hearing in *Johnson* v. *Superior Court* (1975) 15 Cal.3d 248 [124 Cal.Rptr. 32, 539 P.2d 792], however, Justice Friedman held that the obligation of the prosecutor to assure independence, procedural regularity, and fairness in grand jury proceedings is compelled by due process: "The grand jury's ability to safeguard accused persons against felony charges which it believes unfounded is an attribute of due process of law inherent in the grand jury proceeding; this attribute exists for the protection of persons accused of crime before the grand jury, which is to say that it is a 'constitutional right;' any prosecutorial manipulation which substantially impairs the grand jury's ability to reject charges which it may believe unfounded is an invasion of the defendant's constitutional right. Although self-restraint and fairness may be the rule, unrestraint and unfairness the exception, the inner core of due process must be effectively recognized when the exception occurs. When the prosecutor manipulates the array of evidence to the point of depriving the grand jury of independence and impartiality, the courts should not hesitate to vindicate the demands of due process."

In *Johnson,* this court found it unnecessary again to reach the due process issue since we determined that the prosecutor is compelled under state law to reveal to the grand jury the existence of exculpatory evidence in order that the grand jury may exercise its power under Penal Code section 939.7 to obtain that evidence. We recognized, however, that the Fifth Amendment guarantee that a defendant not be held to answer in a federal prosecution for capital and otherwise infamous crimes "unless on a presentment or indictment of a Grand Jury" presupposed a grand jury acting independently of the prosecutor or judge, and that the function of

the federal grand jury "as a protective bulwark standing solidly between the ordinary citizen and an overzealous prosecutor" (*United States* v. *Dionisio* (1973) 410 U.S. 1, 17 [35 L.Ed.2d 67, 81, 93 S.Ct. 764]), was equally that of a state grand jury. (*Johnson* v. *Superior Court, supra,* 15 Cal.3d 248, 253-254.) If the grand jury cannot fulfill its obligation to act independently and to protect citizens from unfounded obligations (*In re Tyler* (1884) 64 Cal. 434, 437 [1 P. 884]) when not advised of relevant exculpatory evidence, neither can it do so if it is invited to indict on the basis of incompetent and irrelevant evidence. ▇▇▇ It follows therefore that when the extent of incompetent and irrelevant evidence before the grand jury is such that, under the instructions and advice given by the prosecutor, it is unreasonable to expect that the grand jury could limit its consideration to the admissible, relevant evidence (see *People* v. *Aranda* (1965) 63 Cal.2d 518, 528-529 [47 Cal.Rptr. 353, 407 P.2d 265]), the defendants have been denied due process and the indictment must be dismissed notwithstanding Penal Code section 939.6.

Although we condemn the presentation of incompetent and irrelevant evidence to the grand jury in this case, we have concluded after a full review of that evidence that in this instance defendants were not prejudiced. The nature and extent of the inadmissible evidence was not such that it may have compromised the independence of the grand jury and contributed to the decision to indict.

Defendants argued in support of their claim that excessive inadmissible evidence had been presented to the grand jury and that the testimony of Spears and Breiling was inadmissible. As we have shown above, those claims lacked merit, and the grand jury was advised that Spears' preliminary hearing testimony was not to be considered against Backus. Defendant Backus also complained that the grand jury had not been instructed that Breiling's testimony should not be considered against him. The People concede that the part of Breiling's testimony which included Joseph's recital to him of statements made by Backus was hearsay, not admissible against Backus. These statements were cumulative, however, the same conversation having been described by Oliver and Irwin who had been present at the time the statements were made. Therefore, although the grand jury should have been instructed by the prosecutor of the limited purpose of Breiling's testimony, it was admissible, and consideration of the testimony by the grand jury did not deny due process.

▇▇▇ Defendants also object to the presentation to the grand jury of the memorandum of law that the prosecutor had filed earlier in the

municipal court in which the preliminary hearing had been held. However, that brief document was devoted solely to a statement of the prosecutor's view of the scope of the immunity granted by Health and Safety Code section 11367. Although it was not evidence admissible at trial and thus should not have been given to the grand jury, defendants were not prejudiced in that the argument set forth therein, although reaching an erroneous legal conclusion, reflected legal advice which the prosecutor could have given to the grand jury directly.

Finally, defendants object to the grand jury consideration of the reporter's transcript of the prior preliminary hearing. That document, like the memorandum of law, was not evidence admissible at trial and it should not have been given to the grand jury. However, our review of the transcript suggests that rather than being prejudicial to defendants, if fully read by the grand jury, it could have been helpful.[17] The first volume of transcript contained only the testimony of Spears, which, as we have held above, was admissible and was read to the grand jury. Defendants do not suggest, and we do not perceive, any reason for believing that they were prejudiced as a result of the grand jury having available a transcript of the testimony that that grand jury had already heard.

The other witnesses whose preliminary hearing testimony was included in the transcript were Larry Oliver, Debra Soria, Rosalie Squires, Daniel Garcia, Ann Elizabeth Ellis, Robert Cash, and Robert Michael Murphy. Soria and Squires testified before the grand jury consistently with their preliminary hearing testimony on direct examination. Murphy was not a witness at the grand jury hearing. He testified at the preliminary hearing that he knew defendant Joseph and that he had not received narcotics from him, although he might have told an investigating officer that he had done so. He expressly denied having gone to Joseph's home or having received heroin from him and did not remember telling Backus that Joseph had told him not to talk.

The cross-examination of each of these witnesses, as well as Garcia who testified that Ward had given him heroin, was devastating to the People's case. Soria, who was taking prescribed Thorazine, was so

---

[17]The 3-volume, 507-page transcript exceeded the length of the reporter's transcript of the grand jury hearing by more than 100 pages. The indictment was returned at 3:11 p.m. on March 17, 1976. After a luncheon recess, which concluded at 1:30 p.m., the grand jury heard one witness, whose testimony was interrupted by another recess, before the jurors commenced deliberations. It appears unlikely, therefore, that the grand jury did fully review the transcript of the preliminary hearing.

confused and contradictory that the examination was recessed to give her time to rest. At the time of the testimony she was free on bail in two pending felony prosecutions. She admitted stating that she was going to testify against the defendants to "let the pigs know how it feels."

Squires admitted having told counsel for defendant Joseph that Joseph had never given her heroin, and that she had told an investigator that she was frightened about the outcome of criminal charges then pending against her if she did not testify. She was concerned that if she testified that Joseph had not given her heroin the pending cases might be harder on her. At the time Garcia testified he had charges pending against him. Murphy testified that he had made statements to Backus and Rodman implicating Joseph only because the investigating officers had threatened him with prosecution for conspiracy if he did not make a statement. He had been arrested in another county for probation violation, held in jail overnight, and brought to the Salinas Police Department for questioning in the on-going investigation. After his statement had been made, he was finally released when his probation officer was called in and told him to report in once a month. He testified that his statement had been untrue and had been given only because he felt threatened and wanted to be released. He had been taking methadone. Backus had told him he would receive his medicine after he took a polygraph examination.

In discharging the defendants the magistrate stated that he could not accept Squires' testimony and that the remaining witnesses [other than Oliver and Spears] had all been discredited. All had admitted testifying because they hoped their doing so would help them in pending prosecutions.

■ Under the circumstances it would appear that having available the transcript of the cross-examination of these witnesses, whose testimony before the grand jury had not been so impeached, could not have prejudiced defendants. Absent any indication by defendants in their motions of the manner in which they believe they were prejudiced by grand jury consideration of the preliminary hearing testimony of these or any of the other witnesses,[18] we conclude that the availability of the

[18]Oliver's preliminary hearing testimony paralleled his testimony before the grand jury. Ellis testified only that she had been Soria's probation officer in 1973, and that she had requested a warrant for Soria's arrest on the day after Soria was placed in a treatment center. Cash, a Salinas police sergeant, had with him a report concerning the theft of guns from the district attorney's office and a burglary of a local business. The reports indicated that the property stolen in the latter had been recovered and that Joseph had signed the evidence tags.

Inasmuch as Garcia refused to be sworn at the grand jury hearing and recanted his preliminary hearing testimony, denying to the grand jury that he had been given heroin

transcript of the preliminary hearing did not cause such prejudice to defendants as to deny due process in the grand jury proceedings.

## IV

### OTHER CLAIMS

Defendant Joseph, whose claims were adopted by defendant Ward, also urged in support of the motion to dismiss that the facts upon which the indictment is based were adjudicated in favor of defendants by the magistrate at the prior preliminary hearing and are thus res judicata. ■ Defendants concede, as they must, that a dismissal by a magistrate after a preliminary hearing is not a bar to filing a subsequent complaint or to seeking a grand jury indictment. (*People* v. *Uhlemann* (1973) 9 Cal.3d 662, 665-666 [108 Cal.Rptr. 657, 511 P.2d 609].) They argued alternatively, however, that the magistrate expressed disbelief in the testimony of the witnesses other than Oliver and Spears on several occasions, that he believed they were entrapped, and that the action of the prosecutor in seeking the indictment five months after the dismissal was an abuse of discretion sufficient to warrant an exercise by this court of its inherent power to protect against such abuse.

None of these grounds affords a basis for dismissal of the indictment. The record does not demonstrate abuse of prosecutorial discretion, but rather a continuing investigation of the circumstances surrounding the offenses, the discovery of additional evidence, and the presentation of all of this evidence to the grand jury. No improper purpose for the delay in seeking the indictment appears on the record, and defendants suggest no prejudice as a result thereof.

The magistrate's belief in the credibility of witnesses, which may lead him to a personal opinion that a defendant has been entrapped, and an ensuing dismissal is a "personal opinion regarding the guilt or innocence of the accused [which] is of no legal significance whatever in view of the limited nature of the proceedings. . . . [T]he doctrines of res judicata or collateral estoppel are inapplicable to orders dismissing criminal proceed-

---

by either Ward or Joseph, the presentation of his preliminary hearing testimony to the grand jury might have been prejudicial had any of the overt acts named him as a person to whom heroin had been furnished. Since none did, and there was sufficient admissible evidence to support the overt acts charged in counts II and III, the possibility that the grand jury considered his preliminary hearing testimony as relevant to these counts is too remote to support a conclusion that defendants were prejudiced by this portion of the transcript.

ings following preliminary hearings." (*People* v. *Uhlemann, supra,* 9 Cal.3d 662, 667-668.) No harassment of defendants appearing on the record, and no abuse of prosecutorial discretion to proceed by indictment following the discharge of defendants after the preliminary hearing being shown, there is no basis upon which to dismiss the indictment.

The order setting aside the indictment is reversed with directions to deny the motion made pursuant to Penal Code section 995.

Tobriner, J., Mosk, J., Clark, J., Richardson, J., and Newman, J., concurred.

Bird, C. J., concurred in the result.