610 P.2d 38

**STATE of Arizona, Appellee,**

v.

**Marcus T. BAUMANN, Appellant.**

No. 4879.

Supreme Court of Arizona,
En Banc.

March 26, 1980.

Rehearing Denied April 22, 1980.

Robert K. Corbin, Atty. Gen., by William J. Schafer, III, and Diane M. Ramsey, Asst. Attys. Gen., Phoenix, for appellee.

Wilkinson & Quarelli by O. J. Wilkinson, Jr., Phoenix, for appellant.

HAYS, Justice.

On November 2, 1978, appellant was convicted on ten counts of securities fraud in violation of A.R.S. § 44–1991, seven counts of sale of unregistered securities in violation of A.R.S. § 44–1841, seven counts of sale of securities by an unregistered dealer in violation of A.R.S. § 44–1842, and one count of conspiracy in violation of A.R.S. § 13–331(B).

We take jurisdiction pursuant to 17A A.R.S., Supreme Court Rules, rule 47(e)(5).

The pertinent facts as disclosed by the record indicate that Minnesota Title and Trust Company acted as trustee for its land trust 816 which involved property owned by Charlie Hall as first beneficiary (seller) and Western Land Sales [1] as the second beneficiary (buyer). Through a series of assignments, World of Real Estate, Limited, became holder of the second beneficiary's possessory interest. World of Real Estate, Limited, purported to be a land development company whose sole shareholder was appellant.

In order for World of Real Estate, Limited, to convey legal title to the Charlie Hall property, it would be necessary to satisfy the terms and conditions of the trust, thereby enabling the trustee to release the property from the trust. The basic terms of release required that the second beneficiary pay a price of $700 per acre for contiguous 10-acre parcels. Because subdividing the property in compliance with the terms of the trust proved to be economically unfeasible, appellant and his business associates, Albert P. Rotola [2] and Allen J. Besbris [3] devised a scheme purporting to convey title to the Charlie Hall property.

Appellant, his business companions, and their salesmen [4] used friends, close family members, and neighbors to fabricate mortgage packages supposedly created by the legitimate sale of lots in the Charlie Hall property. The acquaintances, neighbors, and relatives acted as lot buyers executing a package of paper which consisted of a purchase and sale agreement, a warranty deed, a purchase money note, and a mortgage. The paper was further embellished by a substantial down payment and monthly payments at a high interest rate which were never paid by the sham lot buyer. In fact, the individual salesman expressly assured the people masquerading as lot buyers that the down payment need not be made and that few if any of the monthly installments need ever be made. In return for the mythical obligation represented by these mortgage packages, appellant, through World of Real Estate, Limited, conveyed title by warranty deed to the sham lot buyers. These mortgage packages were then transferred from World of Real Estate, Limited, as land developer, to Bankers' Finance and Holding Company, a mortgage broker, whose sole shareholder was appellant, for the purpose of selling the packages to investors. This device of raising capital by creating or acquiring specious mortgages and selling them to innocent investors is known as fenceposting.

The investors, and real victims of the scheme, were for the most part elderly retired people who spent part of the year

---

1. See *United States v. McDonald*, 576 F.2d 1350 (9th Cir. 1978), *cert. denied*, 439 U.S. 830, 99 S.Ct. 105, 58 L.Ed.2d 124 (1978), for appellant's conviction for his activities with Western Land Sales.

2. Rotola was president of World of Real Estate, Limited. As a result of a plea bargain, Rotola entered a guilty plea to one count of securities fraud for his part in this scheme. Appellant met Rotola while both were working at Western Land Sales.

3. Besbris served as house counsel for Western Land Sales where he met appellant. Besbris left Western Land Sales to become house counsel for appellant's organization and later represented appellant's business operations on retainer. Besbris was named in the original indictment along with appellant, Robert C. Strome, and Monte Lee Burr. Besbris was convicted in federal court for his part in the Western Land Sales schemes. *See United States v. McDonald, supra.*

4. Robert Strome, Monte Burr, and two others who died before the indictment was returned.

residing in Arizona. These investors risked sums of money which constituted their life savings or retirement security in hope of adding to their fixed retirement incomes. In buying these mortgage packages the investors took with recourse against Bankers' Finance and Holding Company so that should the lot buyer ever default on the mortgage the investor could look to Bankers' for satisfaction of the obligation.

Bankers' supported the bad paper until the cost of that paper produced serious cash flow problems for the Bankers' organization. At that time appellant and his salesmen sold short-term corporate notes, secured by fenceposted mortgages, to raise money to support the Bankers' operation.

The corporate promissory notes were redeemable in nine months at 10% and 12% interest. The investor received, as security for the corporate notes, mortgage packages on land with value supposedly equal to or greater than the face value of the corporate note.[5] Additionally, investors were assured that not only would they get the 10% or 12% interest on the corporate note but, during the term of the note, the investors expected to get the monthly payments on the mortgage as well.

The property supporting the mortgages used to secure the corporate notes was remote, desolate land acquired through tax sales, repossessions, and defaults, which in fact had a value considerably less than that represented on the face of the documents. When it became apparent that Bankers' would default on the corporate notes, the sham lot buyers executed deeds in lieu of foreclosure in favor of the investors.

During the six months that appellant and his cohorts worked this scheme, at least ten investors risked and lost almost $100,000. The investors received either worthless arid desert land or nothing at all as a return on their investment.

The appellant received concurrent nine- to ten-year sentences on the securities fraud counts, concurrent three- to four-year sentences on the unregistered securities counts, concurrent three- to four-year sentences on the unregistered dealer counts, and a three- to four-year sentence on the conspiracy count. The sentence for the conspiracy, unregistered securities, and unregistered dealer counts were to run concurrently with the sentence received for appellant's federal mail fraud convictions[6] and consecutively to the sentence imposed for the securities fraud counts.

## STATE GRAND JURY PROCEEDINGS

Appellant challenges the indictment handed down by the state grand jury on a number of grounds: (1) the grand jury heard only hearsay evidence and was denied exculpatory evidence; (2) the assistant attorney general improperly gave legal advice and subtly persuaded the grand jury to return the indictment; and (3) the indictment was improperly remanded and thereafter should have been dismissed.

Appellant's claim that an indictment may not be returned on hearsay evidence finds no support in the law of Arizona. *See State ex rel. Preimsberg v. Rosenblatt*, 112 Ariz. 461, 543 P.2d 773 (1976); *State ex rel. Berger v. Myers*, 108 Ariz. 248, 495 P.2d 844 (1972); *State v. Cousino*, 18 Ariz.App. 158, 500 P.2d 1146 (1972). Appellant's reliance on *People v. Backus*, 23 Cal.3d 360, 152 Cal.Rptr. 710, 590 P.2d 837 (1979), is misplaced because the reasoning in that case turns on a California statute which has no Arizona counterpart.

 The contention that a grand jury must consider all exculpatory evidence misreads the grand jury's primary function of determining whether probable cause exists to believe that a crime has been committed and that the individual being investigated was the one who committed it. A.R.S. § 21–413; 17 A.R.S. Rules of Criminal Procedure, rule 12.1(d)(4). Any more would

---

5. At this point in the scheme, the mortgages were being fenceposted through Rotola Investment and Mortgage Company whose president was Albert P. Rotola.

6. *See United States v. McDonald, supra,* n. 1.

put grand juries in the business of holding minitrials. *Marston's, Inc. v. Strand*, 114 Ariz. 260, 560 P.2d 778 (1977); *State v. Horner*, 112 Ariz. 432, 543 P.2d 118 (1975); *State v. Bell*, 589 P.2d 517 (Hawaii 1978). Moreover, a review of the record of the trial indicates that no such clearly exculpatory evidence was available.

■ Having examined the transcript, we find no merit in the claim that the assistant attorney general improperly advised the grand jury or persuaded it to return an indictment. A.R.S. § 21–408(A); *Marston's, Inc. v. Strand, supra*; *State v. Hocker*, 113 Ariz. 450, 556 P.2d 784 (1976), *overruled on other grounds, State v. Jarzab*, 123 Ariz. 308, 599 P.2d 761 (1979); *State v. Good*, 10 Ariz.App. 556, 460 P.2d 662 (1969).

The state grand jury originally returned a 112-count indictment against appellant and three others.[7] Count 112 of the original indictment was the conspiracy count which, while legally sufficient on its face, was remanded for a new finding of probable cause because the assistant attorney general failed to explain the overt act requirement of the Arizona laws of conspiracy. The trial judge felt that since the erroneous legal opinion could have misled the grand jury on the conspiracy count only, it was unnecessary to send the entire indictment back for a new finding of probable cause on all counts. The trial judge remanded Count 112 and expressly indicated by his order that the court did not intend to sever any defendant or any count. Further, the court ordered that if the grand jury did find probable cause existed after reconsidering the evidence in light of a correct statement of the law, the proposed Count 112 should be assigned the same cause number as the previously returned 111 counts.

The state grand jury returned what it called a "Superseding Indictment" and enumerated as "Count I" an indictment identical to the one which was returned as Count 112 previously. In addition, the grand jury returned a list of overt acts not included in the original indictment. The trial court subsequently ordered the indictment to be identified as Count 112 of the original indictment.

Appellant argues that Rule 12.9, Arizona Rules of Criminal Procedure, does not authorize the trial judge to remand only a part of an indictment. Appellant contends that if a new finding of probable cause is required, the entire indictment must be reconsidered. We cannot agree.

■ The duty of a grand jury is to decide whether probable cause exists and that probable cause determination may only be challenged by a motion alleging the defendant was denied a substantial procedural right or that an insufficient number of grand jurors concurred in the indictment, 17 A.R.S. Rules of Criminal Procedure, rule 12.9. Here, appellant received a valid determination of probable cause on the first 111 counts of the indictment originally and on Count 112 after the remand. Appellant received his due on each count; that is, a determination that there existed probable cause to believe a crime was committed and that he was the one who committed it. Absent a showing of prejudice in these grand jury proceedings, there can be no reversible error. *State v. Hocker, supra*; *State v. Good, supra*. We also note that returning the entire indictment would have created unnecessary delay and complexity in the grand jury proceedings. 17 A.R.S. Rules of Criminal Procedure, rule 1.2.

### ROTOLA'S TESTIMONY

■ Appellant contends that the trial court erred by inquiring into the prospective jurors' ability to judge the testimony of a witness indicted in a related cause number and who, as part of a plea bargain, agreed to testify at appellant's trial. The purpose of *voir dire* examination is to determine whether prospective jurors can fairly and impartially decide the case at bar and the scope of such examination is within the sound discretion of the trial judge. *State v. Smith*, 114 Ariz. 415, 561 P.2d 739 (1977);

---

**7.** *See* note 3 *supra*.

*State v. Bullock*, 26 Ariz.App. 149, 546 P.2d 1158 (1976); 17 A.R.S. Rules of Criminal Procedure, rule 18.5. We find no abuse of discretion in the instant case.

■ Appellant further claims that it was incumbent upon the trial judge to give a cautionary instruction requiring the jury to scrutinize more closely the testimony of a witness who provides evidence because of a plea agreement than it would the testimony of an ordinary witness. Appellant's instruction runs contrary to the law of this state and would amount to an impermissible comment on the evidence. *State v. Settle*, 111 Ariz. 394, 531 P.2d 151 (1975); *State v. Korte*, 115 Ariz. 517, 566 P.2d 318 (App. 1977); Ariz.Const. art. 6, § 27.

■ Albert P. Rotola entered into a plea agreement in which he promised to cooperate with the state in the investigation and prosecution of other individuals involved in this scheme and to testify truthfully and completely to all crimes mentioned in the agreement. Rotola's attorney received a copy of a letter written by the assistant attorney general to the sentencing judge explaining why the plea bargain was in the interest of justice, but Rotola never saw the letter nor was he ever advised of its contents. At trial, appellant's counsel sought to impeach Rotola by claiming that the letter created a tacit condition or codicil to the plea bargain requiring that Rotola give incriminating evidence against appellant. The trial judge refused to admit the letter because the witness testified that he had never seen the letter, and it would be impossible to prove bias or prejudice in a document about which the witness knew nothing. We agree and note that Rule 17.4(c), Arizona Rules of Criminal Procedure, requires that before a plea is accepted, the court shall determine "that the written document contains all the terms of the agreement." The written document provided that Rotola was to give truthful testimony and Rotola testified that his understanding of the agreement was that it required only truthful testimony. The trial judge was correct in refusing to admit the letter.

During Rotola's cross-examination, appellant's counsel sought to determine Rotola's present address. The state objected and the trial court sustained the objection, allowing appellant to inquire into the nature of the witness' current employment as well as the county and state of his residence but not the street address. In ruling on the objection, the trial court learned from the witness' counsel that the witness feared harassment or retribution from appellant.

■ The United States Supreme Court has said that the sixth amendment right of confrontation includes inquiry into the witness' place of residence so that a jury can identify the witness and so that the defendant can ascertain the witness' reputation for truthfulness in his community. *Smith v. Illinois*, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968); *Alford v. United States*, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931). A wholesale denial of cross-examination without waiver cannot be harmless error, *Brookhart v. Janis*, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966), but we are not faced here with a situation where the defendant was prevented from testing the credibility of the witness or eliciting testimony directly relating to the issues in the case. We find no error in the discretion exercised by the trial judge when he limited cross-examination on the witness' present place of residence to the county and state of residence. In *State v. Fleming*, 117 Ariz. 122, 125, 571 P.2d 268, 271 (1977), we said:

> Distinctions between reasonable limitations on the scope of cross-examination and unnecessary restrictions on the right to confront witnesses are, however, difficult to draw and must be considered on a case-by-case basis. The test is whether the defendant has been denied the opportunity of presenting to the trier of fact information which bears either on the issues in the case or on the credibility of the witness.

The witness was thoroughly cross-examined on every phase of his business relationship with appellant, his plea agreement and the sentence served for his part in this scheme, his other convictions, and his motive for

testifying. A review of the record indicates that direct and cross-examination provided the jury with sufficient testimony to weigh the witness' credibility and in addition revealed that the witness' street address at the time of trial had no bearing whatever on any issue to be decided. We find no violation of appellant's right of confrontation.

## COCONSPIRATOR'S STATEMENTS

Appellant contends that statements of coconspirator Robert C. Strome were improperly admitted at trial. Expressly excluded from the definition of hearsay in the Arizona Rules of Evidence, rule 801(d)(2)(E), are statements made by coconspirators during the course and in the furtherance of the conspiracy. Statements of a coconspirator will be admitted when it has been shown that a conspiracy exists and the defendant and the declarant are parties to the conspiracy. *State v. Sullivan*, 68 Ariz. 81, 200 P.2d 346 (1948). It is not necessary that a conspiracy be charged, *State v. Skinner*, 110 Ariz. 135, 515 P.2d 880 (1973), as long as the record reveals sufficient reliable evidence of a conspiracy to support the admission of the statements of the coconspirator. *State v. Brewer*, 26 Ariz. App. 408, 549 P.2d 188 (1976); *State v. Speerschneider*, 25 Ariz.App. 340, 543 P.2d 461 (1975). In the instant case, conspiracy was charged and a review of the record indicates ample evidence of the existence of a conspiracy. At the time the coconspirator's statements were admitted, evidence of conspiracy included Albert Rotola's testimony about the roles of both the declarant and appellant in the scheme, testimony of a victim investor relating the manner in which she came to know appellant through the declarant, and evidence that mortgage packages sold by the declarant were approved by appellant. Moreover, the trial judge noted the fact that the declarant had been indicted as a coconspirator in the same cause number as appellant, had never been severed, and had entered a plea of *nolo contendere* to the charge of conspiracy on the first day of trial. We think the statements of the coconspirator were properly admitted.

## REGISTRATION EXEMPTIONS

Appellant asserts that the convictions for sale of unregistered securities and sale of securities by an unregistered dealer must fall because the securities sold were exempted from registration by A.R.S. §§ 44–1843(8) and 44–1843(10).

Regulation of transactions in securities, commonly known as "blue sky laws," are designed to protect the public from fraud and deceit arising in those transactions. Since much of the public lacks the knowledge and sophistication of those who trade regularly in the securities marketplace, blue sky laws act as a buffer between purveyors of worthless securities and that segment of the public which can ill afford to fall victim to fraudulent investment schemes.

In *Jackson v. Robertson*, 90 Ariz. 405, 409–10, 368 P.2d 645, 648 (1962), we said:

> It is the capacity for harm and danger to the public as well as accomplished fraudulent transactions to which the Securities Act is directed. The Act is designed to be prophylactic if possible, remedial only if necessary.

Not only is fraud in the sale of a security a violation of A.R.S. § 44–1991, but the statutes requiring registration of securities and dealers are designed to make the possibility of fraud even more remote. *See* A.R.S. §§ 44–1841 and 44–1842. Unless a particular security or transaction falls within one of a few limited exemptions, all securities must be registered before they can be offered for sale and all dealers in securities must register with the Corporation Commission. Because of the vital public policy underlying the registration requirement, there must be strict compliance with all the requirements of the exemption statute. *State v. Goodman*, 110 Ariz. 524, 521 P.2d 611 (1974). The exemptions exist where the nature of the transaction or security exempted is either sufficiently protected from the possibility of fraud or where the need to trade freely in the exempted security out-

**412**

weighs the risk of fraud in the security or transaction.

 Here, appellant argues that the securities sold were exempt from the registration requirement by virtue of A.R.S. §§ 44–1843(8) and 44–1843(10). We note that A.R.S. § 44–2033 places the burden of proving the existence of an exemption upon the party raising the defense. *State v. Goodman, supra. See United States ex rel. Shott v. Tehan*, 365 F.2d 191 (6th Cir. 1966), *cert. denied*, 385 U.S. 1012, 87 S.Ct. 716, 17 L.Ed.2d 548 (1967). *See also Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). Appellant argued his contention to the jury, introduced witnesses who testified that both they and appellant believed the securities to be exempt, and the jury had the benefit of the documentary evidence in their deliberations. The jury was properly instructed on the law relating to the exemptions [8] but the jury decided that appellant had not carried his burden of proving the exemption.

The trial court further instructed the jury that before appellant could avail himself of the exemption, appellant must hold a good-faith belief that the security to be exempted was in fact a bona fide security. Stated another way, the benefit of the exemption runs to the individual who comes to the statute believing he holds real mortgage paper or genuine corporate promissory notes. It cannot be said the legislature intended to allow an individual, holding what he knows to be fraudulent paper, to enjoy the benefits of a statute designed to protect the public from the evils of transactions in fraudulent securities. The jury was properly instructed and there was sufficient evidence to support the verdict.

### EXCESSIVE SENTENCE

 Appellant contends that the sentence was excessive. The sentence given was within the statutory limits of A.R.S. §§ 13–331 and 44–2036 and where the rec-

ord reveals no abuse of discretion, the sentence imposed will not be overturned on appeal. *State v. Patton*, 120 Ariz. 386, 586 P.2d 635 (1978); *State v. O'Neill*, 117 Ariz. 343, 572 P.2d 1181 (1977).

The judgment of conviction and the sentence are affirmed.

STRUCKMEYER, C. J., HOLOHAN, V. C. J., and CAMERON and GORDON, JJ., concur.

---

8. The jury was not instructed by the trial judge that appellant must carry his burden with respect to proving the exemptions. Instead, the jury was instructed that the burden of proof rested wholly with the state. Any error in the omission of such an instruction inured solely to appellant's benefit.