693 P.2d 936

**STATE of Arizona, Appellee,**

v.

**Alfonso CHAVEZ, Jr., Appellant.**

**Nos. 1 CA–CR 6116, 1 CA–CR 6117 and 1 CA–CR 6168.**

Court of Appeals of Arizona, Division 1, Department D.

Jan. 10, 1984.

**282**

Robert K. Corbin, Atty. Gen. by William J. Schafer III, Chief Counsel, Criminal Division, Jessica Gifford and Georgia Ellexson, Asst. Attys. Gen., Phoenix, for appellee.

Thomas A. Thinnes, P.A. by Thomas A. Thinnes, Eleanor L. Miller, Phoenix, for appellant.

## OPINION

GREER, Judge.

In January, 1981, the defendant was charged by complaint with aggravated assault and custodial interference in CR–117107. In March, 1981, after his release from jail, he was indicted for a separate aggravated assault and kidnapping in CR–118359. In July, 1981, pursuant to the terms of a written plea agreement, he pled guilty to the two counts of aggravated assault. In return for the plea agreement, the state agreed to dismiss the custodial interference and kidnapping charges. The trial court accepted the defendant's guilty plea and placed him on probation for a period of five years. In October, 1981, a short time after his second release from custody, an eight count indictment was returned against him, including burglary in the first degree, four counts of aggravated assault, endangerment, kidnapping, and misconduct involving weapons, all dangerous felonies. The defendant was convicted of two counts of aggravated assault, first degree burglary, kidnapping, and misconduct involving weapons. In April, 1982, the trial court revoked the defendant's probation and sentenced him to consecutive maximum terms of ten years imprisonment on both aggravated assault charges. In May, 1982, the defendant was sentenced on the jury convictions as follows:

Burglary first degree—1.5 years consecutive to CR–117107.

Aggravated assault—7.5 years consecutive to CR–117107.

Kidnapping—10.5 years consecutive to the count one.

Aggravated assault—7.5 years concurrent with count one.

Misconduct involving weapons—1.5 years concurrent with count one.

The defendant has raised four issues on appeal:

1. Whether prosecutorial misconduct in the closing argument deprived him of a fair trial.

2. Whether the trial court improperly instructed the jury on the insanity defense.

3. Whether his sentence on the jury conviction is excessive. And,

4. Whether the sentences on the initial two aggravated assault convictions are excessive.

## PROSECUTORIAL MISCONDUCT

Defendant contends that parts of the state's closing argument were unethical and improper. Initially, we note that the defendant did not make any objections to the closing argument at trial. When a defendant makes no objection to certain instances of prosecutorial misconduct during closing argument and the error is not fundamental, the right to have the matter reviewed on appeal is waived. *State v. Dixon*, 126 Ariz. 613, 617 P.2d 779 (App. 1980).

The general rule for determining whether a prosecutor's remarks are so objectionable as to require a reversal is whether the remarks called to the jury's

attention matters which they would not be justified considering and whether the remarks adversely influenced the jury. *State v. Robles*, 135 Ariz. 92, 659 P.2d 645 (1983); *State v. Landrum*, 112 Ariz. 555, 544 P.2d 664 (1976). We have reviewed the record and believe that it contains evidence which would support the prosecutor's remarks that the defendant contrived the insanity defense. Thus, we do not believe it was improper to make such a comment. *See Commonwealth v. O'Brien*, 377 Mass. 772, 388 N.E.2d 658 (1979) (the prosecutor was entitled to establish, if he could, that the defendant had contrived his insanity defense). We do not believe any of the prosecutor's statements can fairly be interpreted as intimating that defendant's attorney had fabricated the defense. Thus, we do not find the state's closing argument constituted fundamental error requiring reversal.

## INSTRUCTION ON INSANITY DEFENSE

The defendant also claims that the court improperly instructed the jury on the definition of insanity. We agree. The instruction left out the first prong of the *M'Naghten* rule. *See State v. Everett*, 110 Ariz. 429, 520 P.2d 301, *cert. denied*, 419 U.S. 880, 95 S.Ct. 144, 42 L.Ed.2d 120 (1974). Our supreme court has also stated its disapproval of this exact instruction. *State v. Brosie*, 113 Ariz. 329, 553 P.2d 1203 (1976). Thus, the instruction should not have been used.

■ The state points out, however, that in *State v. Brosie*, our supreme court found the giving of this instruction to be harmless error. The court reasoned:

> The jury was instructed that if it determined appellant did not know the probable results of his acts, then he was not sane. It must have found, in order to return a guilty verdict, that appellant knew the probable consequences of his acts. Since the jury found that appellant knew the probable consequences of his acts, it must have believed that he was aware of the nature of the acts, what the

acts were. Or, to put it conversely, if the jury believed the defendant did not know the nature of his acts, it could not have found that he knew their probable results.

*Id.* at 331, 553 P.2d at 1205. We hesitate to agree that a person will always know the nature of his acts merely because he knows what their likely effect will be. Further, although we agree with the dissent's critical analysis of our supreme court's reasoning in *Brosie*, we are unable to avoid the court's legal conclusion that, although the instruction was improper, it was harmless error. Thus, based upon *State v. Brosie*, we hold that although the court erred by giving the instruction, such error was harmless.

## EXCESSIVE SENTENCE

■ The defendant contends that his sentence on the initial aggravated assault and the latter sentences were excessive. Specifically, he claims that the trial court failed to consider the testimony regarding his mental condition and other factors. The imposition of a sentence within the statutory limit is entirely within the discretion of the trial court. *State v. Ferreira*, 128 Ariz. 530, 627 P.2d 681 (1981). Any challenge thereto must be carefully scrutinized because the trial judge is in the best position to evaluate a defendant. *See State v. Gordon*, 125 Ariz. 425, 610 P.2d 59 (1980). We will not disturb a sentence within the statutory limit unless it reveals an abuse of discretion. *State v. Baumann*, 125 Ariz. 404, 610 P.2d 38 (1980); *State v. Limpus*, 128 Ariz. 371, 635 P.2d 960 (App.1981). An abuse of discretion is characterized by arbitrariness or capriciousness, and a failure to conduct an adequate investigation into the facts relevant to sentencing. *State v. Gordon; State v. Patton*, 120 Ariz. 386, 586 P.2d 635 (1978); *State v. Limpus.* And, with regard to the consecutive nature of the sentences, A.R.S. § 13–708 allows for imposition of a consecutive sentence, provided the reasons therefore are set forth on the record. *Id.*

In the instant case, the defendant has been sentenced to a total of forty-one years imprisonment. In support of the maximum sentences imposed for the initial two aggravated assault convictions, the court found the use of a deadly weapon to be an aggravating factor which outweighed any mitigating factors. In listing his reasons for a consecutive sentence the court stated:

The Defendant has a significant potential for violence and the Court believes that society in general, the innocent bystander and particularly those individuals previously domestically involved with Mr. Chavez be protected from Mr. Chavez for the period of time longer than the concurrent sentences would permit.

Further, the offenses occurred at different times, different places, and were not part of the overall same transaction, and the Defendant should not therefore receive the benefit of concurrent time.

And, in explaining its reasons for imposing consecutive sentences on the subsequent convictions, the court stated:

The Court's reasons for imposing consecutive time in this case are:

1. The defendant was on probation at the time he committed the offense;

2. These very serious offenses occurred approximately one week after the defendant's release from custody in connection with a prior incarceration;

3. The defendant is a dangerous individual with a significant potential for violence, who can justify any act violent or otherwise so long as he believes it accomplishes the goal he wishes to accomplish.

The Court therefore believes that society in general, and particularly those closely associated with Mr. Chavez, and more particularly in a domestic manner, need to be protected from Mr. Chavez for a longer period of time than straight concurrent sentences will permit.

■ There can be no question that the sentences imposed are very severe. As the defendant points out, he will likely serve more time than someone convicted of premeditated murder. However, after having substantial contact with the defendant, the trial court was obviously convinced the defendant is a dangerous man who must be incarcerated for the protection of society. We agree. Although we would not necessarily have imposed a sentence of this length, the test is not what we might have done as trial judges. In light of the record before us, it is clear the trial judge was very familiar with the defendant's background. Further, the court gave specific reasons for imposing the sentences it did. Thus, although we believe the sentences are severe, we find no abuse of discretion.

■ The defendant also claims that the sentences on the aggravated assault charges, following revocation of probation, are excessive because they are disproportionate to the original offenses. In citing *State v. Herrera*, 121 Ariz. 12, 588 P.2d 305 (1978), the defendant contends that there is, at best, only a tenuous connection between the five years probation he was ordered to serve and the consecutive ten year sentences eventually imposed.

We find this case clearly distinguishable from *State v. Herrera*. In that case, the court noted that while it is established that a court may increase a sentence for an original offense in light of subsequent, serious criminal activity, the court found the original charge unlikely to have warranted the sentence imposed by the trial court. It was noted that the original crime was one of nonviolence, that the probation officer did not believe defendant was dangerous, and that it was a statutory rape charge, involving consenting individuals. The defendant, nevertheless was sentenced by the trial judge to thirty years to life.

In this case, the original crimes to which appellant pled were violent crimes. A condition of probation was that appellant would seek and obtain psychological counseling, avoid contact with his former wife, and obey all laws. Less than two weeks after appellant was released from the county jail, he again engaged in acts of physical

violence towards several individuals, while armed with a deadly weapon. Not only the nature of the violation, but the original crimes themselves were of such a nature to have warranted severe punishment. We note that the record in CR–117107 and CR–118359 discloses that at the time appellant was allowed to enter the plea agreement, the trial judge who accepted those pleas expressed reservations about the apparent leniency of the sentence and, the presentence report recommended imprisonment.

▮ In reviewing the propriety of the exercise of a trial court's discretion in sentencing matters, the appellate court must look to the circumstances considered by the trial judge. *State v. Patton,* 120 Ariz. 386, 586 P.2d 635 (1978). Based on the record, we do not find that the trial judge in this case abused his discretion in imposing the sentences below.

For all the foregoing reasons, the judgment of the trial court is hereby affirmed.

JACOBSON, J., concurs.

KLEINSCHMIDT, Judge, dissenting.

I agree with the majority opinion except as to the erroneous jury instruction on the defense of insanity. The court gave the following instruction:

A person is insane if he does not know right from wrong, or if he did not know the probable results of his action.

The correct test to establish the defense of insanity in Arizona is that at the time of the criminal act an accused must have had:

(1) Such a defect of reason as not to know the nature and quality of the act, or

(2) If he did know, that he did not know he was doing what was wrong. *State v. Brosie,* 113 Ariz. 329, 553 P.2d 1203 (1976); *State v. Schantz,* 98 Ariz. 200, 403 P.2d 521 (1965), *cert. denied,* 382 U.S. 1015, 86 S.Ct. 628, 15 L.Ed.2d 530 (1966).

In *Brosie* our supreme court said that knowledge of the results of an act can be equated with knowledge of the nature and quality of an act so that the instruction complained of is not always fatal.[1] The very last paragraph of that opinion reads:

As stated, we do not approve of the deletion of the element of knowledge of the nature of the act because it tends to focus the jury's attention only upon the consequences of the defendant's act. Since the error *in the instant case* is harmless, the judgment of conviction is affirmed.

113 Ariz. at 331, 553 P.2d at 1205 (emphasis added).

I take this to mean that whenever the offending instruction is given we must examine the facts of each case to determine whether the error was harmless. Since the supreme court criticized the instruction's tendency to focus only on the consequences of the act it follows that in some cases, under facts different than those presented in *Brosie*, it would be reversible error to give an instruction that deletes reference to the nature and quality of the act. In other words, as I read *Brosie*, nature and quality cannot *always* be equated *solely* with consequences.

While the instruction was harmless in *Brosie* I cannot say that it was here. Confusion as to the correct test permeated the whole trial and threw the insanity issue so out of focus that the defendant was denied

---

1. While I am required to follow *Brosie* when it applies, I would point out that the supreme court's reasoning in that case equates knowledge of the *quality* of the act solely with knowledge of the harmfulness or consequences of the act. This is a narrow definition of "quality." There is a discussion of the history and development of the insanity defense in *State v. Esser*, 16 Wis.2d 567, 115 N.W.2d 505, (1962), in which the Wisconsin court, discussing the issue that confronts us here, said:

We think, however, that including the former element (nature and quality) gives important emphasis to one element of the realization of the wrongfulness of an act. Suppose that one vaguely realizes that particular conduct is forbidden, but lacks real insight into the conduct. He may be furtive about such conduct, but not really be able to make a normal moral judgment about it.

16 Wis.2d at 598, 115 N.W.2d at 521.

due process of law. Not one single person involved in this case ever articulated the correct test for insanity. The judge, no doubt misled by the stock recommended jury instructions, gave the very instruction criticized in *Brosie*. The prosecutrix, based on her cross-examination of Dr. Castillo, apparently believed the test was: (1) whether the defendant suffered from a mental disease or defect, and (2) if so, whether the mental disease or defect would cause the defendant not to know right from wrong. Alternatively, the prosecutrix questioned the doctor as to whether the appellant knew the consequences or results of his acts and another time she referred to appellant knowing the "nature of his offense." The defense lawyer, from all that can be told from the record, apparently accepted from the very beginning the test for insanity criticized in *Brosie*.

Dr. Robert Castillo, the psychiatrist who testified that the defendant was not responsible for his acts, thought the test was "whether someone can distinguish right from wrong." He displayed considerable confusion as to whether the test included the test for competency and in response to prodding from the prosecutrix defined it as "If a person can distinguish right from wrong and if a person understands, you know, the full effect of what he is doing" or variously, in response to further prodding, "whether or not the defendant did know the probable results of his acts."

Dr. Michael Bayless, a psychologist called by the state, defined the test as:

Well, basically I think that the M'Naghten Test is the person's ability to discern right from wrong, the ability to understand, I think, the nature of the proceedings against him that he's being charged with, his ability to assist counsel. It's a legal question . . . .

[T]he M'Naghten Rule is did a person know right from wrong at the time he committed the act.

Dr. Otto Bendheim, a psychiatrist, defined the test as:

This simply asks the question as to whether a person is aware of the wrongfulness of his conduct, if he commits wrongful conduct. If he knows the nature and quality of his conduct *and* if he is able to know right from wrong. (emphasis added.)

Another witness, Dr. Michael Cleary, came closest to a correct statement of the test when he said:

Yes. The test is a variation of the M'Naghten Rule. And under the test in Arizona, the defendant is relieved of responsibility if he did not know the nature and quality of his acts, or if he did not know the meaning between right and wrong . . . .

In other words, he has got to be in a condition where he doesn't know the nature and quality of his acts *and* he doesn't know right from wrong. (emphasis added.)

Both Dr. Bendheim and Dr. Cleary approached a correct statement of the rule and, but for one factor, could be said to have defined its essence acceptably. Both erred by requiring both prongs of the test to exist before a defendant is relieved of criminal responsibility.

The concepts of criminal responsibility and the defense of insanity were fuzzy from the beginning to the end of this trial. The question is whether the confusion really made any difference in the outcome of the case. I acknowledge that there was ample evidence from which the jury could have concluded that the appellant was sane. There was, however, evidence to support the opposite conclusion and much of this could be characterized as going to the issue of whether Chavez knew the quality of his acts—that is his ability to comprehend the harmfulness of his acts.

The evidence shows that the appellant had been a loner all his life, one of several sons of a mother who had suffered from a debilitating mental illness which may be genetically transmitted. He was an angry

and impulsive person who had long suffered from depression. His condition was progressive and grew even worse after the dissolution of his marriage and the breakup of his family. He had symptoms of paranoia. He believed that people were watching him and following him. He developed a religiosity manifested by his surrounding himself with religious artifacts, his former wife's picture included among them. He was obsessed with reuniting his family.

Dr. Bayless, who testified for the state, said that Chavez told him, "I know I was doing something wrong *but I didn't think it was that serious.* I was fighting for my children and it's not wrong for a man to fight for his kids. I did what I felt was right." (emphasis added). When it is added that a belief that conduct so totally unacceptable was not that serious sprang from a defect of reason, the makings of a respectable insanity defense were present. In my opinion, Dr. Bayless' testimony alone is sufficient evidence on knowledge of the quality of the act so that an instruction which emphasized only the knowledge of the consequences of the act was erroneous.

Since the instruction given embodies the knowledge of right from wrong and since Chavez though his act wrongful but justified, I have given thought to whether the instruction might have been barely sufficient. The problem is that knowledge of the degree to which behavior may be wrong clearly has to do with an appreciation of the quality of the act and, indeed, shades into a question of whether conduct is perceived as wrong at all. I cannot say the mistake did not effect the outcome of the case, especially in view of the fact that the jury deliberated for two days before reaching a verdict.

While I share the frustration that many people have with the semantical problems that plague the law's attempt to deal with the violent acts of the mentally ill, there must be standards and we must adhere to them. I would reverse and remand for a new trial.