NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

STATE OF ARIZONA, *Appellee*,

*v.*

COREY ROYALTY, *Appellant*.

No. 1 CA-CR 22-0389
FILED 9-26-2023

---

Appeal from the Superior Court in Maricopa County
No. CR2010-007912-007
The Honorable Howard D. Sukenic, Judge (*Retired*)

**AFFIRMED**

---

COUNSEL

Arizona Attorney General's Office, Tucson
By Karen Moody
*Counsel for Appellee*

Michael J. Dew Attorney at Law, Phoenix
By Michael J. Dew
*Counsel for Appellant*

---

## MEMORANDUM DECISION

Presiding Judge James B. Morse Jr. delivered the decision of the Court, in which Judge Cynthia J. Bailey and Judge Brian Y. Furuya joined.

---

**M O R S E**, Judge:

¶1 Corey Royalty appeals his convictions and sentences for three counts each of first-degree felony murder and attempted armed robbery and one count each of conspiracy to commit armed robbery and conspiracy to possess marijuana for sale. For the following reasons, we affirm.

### FACTS AND PROCEDURAL BACKGROUND

¶2 On July 28, 2010, the Chandler Police Department initiated a "reversal" drug operation in which three undercover detectives posed as drug sellers. The detectives were unaware that the "buyers" planned to lure them with counterfeit money and then rob them in a "drug rip." When one of the buyers pulled a firearm during the transaction, a shootout erupted leaving one detective and two buyers dead, and two other detectives wounded.

¶3 Seven defendants were charged with crimes relating to the incident: Doarnell Jackson, Eldridge Gittens, Jerry Cockhearn Jr., Thandika Singleton, John Webber, Corey Royalty, and Anthony Wright. Royalty and Cockhearn were jointly tried. Because Royalty challenges the sufficiency of the evidence against him, we recite the facts in the light most favorable to sustaining his convictions. *See State v. Guerra*, 161 Ariz. 289, 293 (1989).

¶4 In the summer of 2010, the narcotics unit of the Chandler Police Department ("Chandler Narcotics") was working with a confidential informant ("CI") to make drug arrests. On July 27, the CI received a call from someone he knew to broker drug deals ("Broker"). The Broker said he had some buyers for 500 pounds of marijuana.

¶5 That night, Wright summoned Gittens to his house on Maldonado in south Phoenix ("Maldonado house"). Gittens had known Wright a long time and knew many of his friends, including Royalty.

¶6 The next morning, the CI met the buyers in a Burger King parking lot not far from the Maldonado house. Tatum, one of the buyers,

showed the CI a bag of money that he represented as $250,000 ("money flash") and asked to see a sample of the marijuana ("marijuana flash").

¶7        Gittens arrived at the Maldonado house later that morning. Wright, Royalty, Tatum, Webber, and Singleton were there. Royalty asked Gittens, "Where you been? . . . [Y]ou don't want to make no money?" and said they "flashed [the sellers] already." Royalty removed a bundle of counterfeit money he had provided for the deal from a bag and commented on "how realistic the money . . . looked" as he circulated it among Gittens, Jackson, Webber, and Singleton.

¶8        Chandler police offers ran the operation. Sergeant C. put a team together to proceed with a marijuana flash. Detective C.L. and Detective B.A.,[1] posing as Mexican drug sellers, drove to the same Burger King parking lot around 12:30 p.m. with a bale of marijuana. Other officers, including Sergeant C., Detective F., and Detective H., conducted surveillance and monitored the interaction. Tatum, Singleton, and Webber arrived on behalf of the buyers. Royalty drove separately in his Chevy Silverado truck to observe the meetup. When Royalty returned to the Maldonado house after the flash, he reported that "everything looked good" and "nothing was out of the ordinary."

¶9        The buyers agreed to go forward with the deal and insisted it be done at the Maldonado house. That afternoon, Cockhearn and Markiese, Royalty's nephew, arrived at the Maldonado house.[2]

¶10        At the Maldonado house, Wright told Gittens that the plan was to steal the marijuana from the sellers. Gittens, Cockhearn, Markiese, and Jackson were to hide in a closet—all carrying firearms. Tatum—who was also armed—would lead the sellers into the house at which point Gittens and the others would "take them down and secure the marijuana." Wright first instructed Gittens that he should take the keys to the load vehicle and drive it to a house that Wright rented nearby. But at Royalty's insistence, the plan changed to Gittens driving the marijuana to Royalty's house.

---

[1]        We refer to the officer victims by two initials, to distinguish them from nonvictim officers, to whom we refer with one initial.

[2]        We refer to Markiese by his first name to avoid confusion with the defendant.

¶11 As Detective F. monitored the Maldonado house, he saw five cars including a Silverado with Diamondback plates. The detective then photographed Royalty talking to others outside the house and driving away in the Silverado with Singleton in the front passenger seat.

¶12 Not long after Detective F. saw Royalty and Singleton leave, detectives observed the Silverado park in the shopping center parking lot next to their undercover vehicle. Detective M. could see the Silverado driver, and he later identified Royalty as the driver in a photo lineup.

¶13 Detective D.B., an "undercover seller," the CI, and the Broker met Webber in the Burger King parking lot and followed him to the Maldonado house. Royalty's Silverado left the parking lot around the same time.

¶14 When Detective D.B. arrived, Tatum would not produce the money and expressed concern about doing the deal. To reassure the buyers, Detectives B.A. and C.L. drove the load vehicle to the Maldonado house and flashed the load in the driveway to Tatum. The detectives then left. As these events were occurring, Royalty's Silverado was seen driving around the neighborhood.

¶15 After the buyers insisted on doing the transaction at the Maldonado house, Detective D.B. returned with the CI and the Broker. Royalty and Wright left the house during that time.

¶16 When the sellers arrived sooner than expected, Gittens called Wright about the sellers arriving before they were "staged," and Wright told him not to worry because "[Tatum] and Jackson and those guys" would "take care of it." As Detective D.B. walked into the front room of the house, Jackson opened a bag from a distance and flashed the money. Detective D.B. then called in the load vehicle.

¶17 As the load vehicle was arriving at the Maldonado house, Detective H. saw Royalty's Silverado drive by him in the neighborhood. When the load vehicle pulled into the garage of the house, Chandler police approached the house. The approaching officers saw a vehicle matching Royalty's Silverado driving in the opposite direction.

¶18 Jackson indicated that he wanted to see the marijuana again so Detective D.B. led him back into the garage. After Detective D.B. returned inside the house, someone said something about counting the money. Detective D.B. walked toward the front room where the money bag was located. As soon as he crossed the threshold, Jackson brought "a rifle

4

up to [his] head." Detective D.B. turned, yelled, and reached for his firearm as he ran back to the kitchen where Detectives B.A. and C.L. were located. Detective B.A. saw a "wall of Black males" approaching the kitchen with guns, and a shootout erupted.

¶19          When the shooting stopped, all three detectives had been hit. Detective C.L. did not survive. Of the buyers, Tatum was dead of a gunshot wound to the torso and Markiese had been shot in the thigh and was bleeding heavily. Police arrived about one minute after the shooting began. The CI, who was uninjured, opened the door to the house and summoned them inside. As other police moved toward the Maldonado house, they apprehended suspects fleeing the scene.

¶20          Around the time of the shooting, Royalty stopped at a friend's residence near the Maldonado house. He was on the phone and did not stay long. When Royalty left, helicopters could be heard overhead. While Jackson and Cockhearn were being taken into custody, Royalty tried to call Markiese. Despite emergency medical efforts, Markiese died at the scene.

¶21          Officers retrieved the bag of money at the Maldonado house. It contained bundles of genuine $1 bills sandwiched between counterfeit $100 bills. In total, the bag contained 999 genuine and 318 counterfeit bills.

¶22          Royalty stowed his Silverado at a friend's house. He then drove to Las Vegas, where he boarded a flight to Tennessee. There, he stayed with a friend, C.R., and obtained documents to change his identity. Royalty told C.R. that they used counterfeit money to get the sellers to bring the marijuana, which they planned to steal, but the sellers showed up early and people were not in the closet as planned. Royalty also made it known to C.R. that he was one of the "bosses" and that his family blamed him for Markiese's death.

¶23          Royalty was apprehended in Tennessee a few weeks after the shootings. The State charged him with three counts of attempted armed robbery (Detectives B.A., C.L., and D.B.), three counts of first degree felony murder (Detective C.L., Tatum, and Markiese), and one count each of conspiracy to commit armed robbery, conspiracy to sell marijuana, and conspiracy to possess marijuana for sale. After the State rested its case, the trial court dismissed the charge of conspiracy to sell marijuana. The jury convicted Royalty of the other counts as charged after considering 30 days of testimony and more than 13,000 exhibits.

¶24          The trial court sentenced Royalty to concurrent and consecutive prison terms that amount, in the aggregate, to life

imprisonment with no possibility of release until after 43 years. We have jurisdiction under A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A).

**DISCUSSION**

**I.      Motion for New Trial.**

**¶25**         Royalty moved for a new trial under Arizona Rule of Criminal Procedure ("Rule") 24.1 subsections (c)(1), (4), and (5). The trial court denied the motion, and Royalty now argues we should reverse its decision because the verdicts were "contrary to . . . the weight of the evidence" under subsection (c)(1).

**¶26**         We review the trial court's denial of a motion for new trial under Rule 24.1(c)(1) for an abuse of discretion, and we will find no abuse if the evidence was sufficient to support the challenged verdict. *State v. Harm*, 236 Ariz. 402, 406, ¶ 11 (App. 2015).

**¶27**         In considering the sufficiency of evidence to support a verdict, we view all facts in favor of the verdict and resolve all evidentiary conflicts against the defendant. *State v. Pena*, 235 Ariz. 277, 279, ¶ 5 (2014). Our review is confined to determining whether there is substantial evidence to support the verdict. *Id.* "Substantial evidence is more than a mere scintilla and is such proof that reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt." *State v. Ellison*, 213 Ariz. 116, 134, ¶ 65 (2006) (cleaned up). If reasonable people "could differ as to whether the evidence establishes a fact in issue, that evidence is substantial." *State v. Mincey*, 141 Ariz. 425, 432 (1984). We do not "reweigh the evidence to decide if [we] would reach the same conclusions as the trier of fact." *State v. Barger*, 167 Ariz. 563, 568 (App. 1990). Substantial evidence may be direct or circumstantial. *State v. Pena*, 209 Ariz. 503, 505, ¶ 7 (App. 2005).

**¶28**         The trial court did not abuse its discretion by denying Royalty's motion for new trial because substantial evidence supports each verdict.

**¶29**         A defendant is guilty of conspiracy to commit armed robbery if the defendant intends to promote or aid the commission of armed robbery, the defendant agrees with one or more persons that one of them or another person will commit armed robbery, and one of the conspirators commits an overt act in furtherance of the armed robbery. A.R.S. §§ 13-1003(A), -1904(A). Evidence was presented that Royalty agreed with, and participated in, the plan to rob the sellers of marijuana by (1) luring them

with counterfeit money; (2) having several armed "buyers" emerge from a closet to take down the sellers; and (3) having Gittens drive the stolen marijuana to Royalty's house. There was also evidence that Royalty was one of the "bosses" of the operation, that he supplied the counterfeit money used in the transaction, and that he conducted surveillance as the operation proceeded throughout the day. Viewed in the light most favorable to sustaining the conviction, there was substantial evidence that Royalty committed conspiracy to commit armed robbery.

¶30        A defendant is guilty of conspiracy to possess marijuana for sale if the defendant intends to promote or aid the possession of marijuana for sale, the defendant agrees with one or more persons that one of them or another person will commit possession of marijuana for sale, and one of the conspirators commits an overt act in furtherance of the offense. A.R.S. §§ 13-1003(A), -3405(A)(2). As described above, the evidence shows that Royalty agreed with others to commit, and provided counterfeit money toward, a plan to steal 500 pounds of marijuana that would be stored at Royalty's house. Such evidence is sufficient to establish that Royalty committed conspiracy to possess marijuana for sale.

¶31        Royalty's other convictions are based on accomplice liability. A defendant acts as an accomplice if the defendant has "the intent to promote or facilitate the commission of an offense" and either "[s]olicits or commands another person to commit the offense," "[a]ids, counsels, agrees to aid or attempts to aid another person in planning or committing an offense," or "[p]rovides means or opportunity to another person to commit the offense." A.R.S. § 13-301. A defendant is criminally responsible for the conduct of another if the defendant "is an accomplice of such other person in the commission of an offense including any offense that is a natural and probable or reasonably foreseeable consequence of the offense for which the person was an accomplice." A.R.S. § 13-303(A)(3).

¶32        A defendant is guilty of attempt to commit armed robbery if the defendant acts as an accomplice to one who attempts, while armed with a deadly weapon or simulated deadly weapon, to take the property of another from his person or immediate presence and against his will by threatening or using force against such other person. A.R.S. §§ 13-1001(A)(2), -1902(A), -1904(A)(1). The defendant is further guilty of first-degree felony murder if "in the course of and in furtherance of" the attempt to commit armed robbery, the defendant's confederate "or another person causes the death of any person." A.R.S. § 13-1105(A)(2). "A death is 'in furtherance' of an underlying offense if the death resulted from any action

taken to facilitate the accomplishment of the felony."  *State v. Herrera*, 176 Ariz. 21, 29 (1993).

¶33 Substantial evidence supports the verdicts for attempted armed robbery and felony murder.  Royalty did not just agree to the plan to commit armed robbery; he also acted as an accomplice to the men tasked with carrying out the crime—Tatum, Jackson, Cockhearn, Gittens, and Markiese.  The evidence shows that Royalty aided his confederates in committing the offense by supplying counterfeit money and surveillance with the intent that the armed robbery be achieved.  Three people died "in the course of and in furtherance of" the attempted armed robbery because those deaths directly resulted from Jackson pointing a rifle at Detective D.B. to steal the marijuana.  A.R.S. § 13-1105(A)(2); *see State v. Howes*, 109 Ariz. 255, 257 (1973) ("We have . . . held that a person engaged in the commission of the crime of robbery which calls into action defensive forces against him the activity of which results in the death of a human being is guilty of murder in the first degree.").

¶34 Royalty complains that Gittens was an unreliable witness, C.R.'s testimony did not make clear whether Royalty described events based on his personal knowledge or obtained from other sources, and police testimony about seeing Royalty's vehicle throughout the day established no more than mere presence.  His argument is unconvincing. In Arizona, "the jury is tasked with weighing the evidence and determining the credibility of the witnesses."  *State v. Allen*, 253 Ariz. 306, 341, ¶ 109 (2022) (cleaned up); *cf. State v. Soto-Fong*, 187 Ariz. 186, 200 (1996) ("This court is not empowered to impose its own determination as to the credibility of [witnesses] in deciding a Rule 20 motion.").  And "one witness, if relevant and credible, is sufficient to support a conviction."  *State v. Montano*, 121 Ariz. 147, 149 (App. 1978).  Even if the testimony of any individual witness might not have provided substantial evidence to support the convictions, the testimony of different witnesses taken together corroborated each individual account and created a cohesive portrait of Royalty's criminal involvement.  Viewing the totality of admissible evidence, including Royalty's flight and attempt to conceal his identity, we conclude that a reasonable person could find beyond a reasonable doubt that Royalty committed the charged crimes.  *See State v. Fulminante*, 193 Ariz. 485, 494, ¶¶ 26–28 (1999) (finding sufficient evidence to sustain a guilty verdict based on "a web of suspicious circumstances tight enough that a reasonable person could conclude, beyond a reasonable doubt, that Defendant was the perpetrator").

## II.    Jury Instructions.

¶35        Royalty contends the trial court committed reversible error by denying his requests to instruct the jury that (1) the State's failure to obtain location information for his cellphone could warrant an inference adverse to the State under *State v. Willits*, 96 Ariz. 184 (1964); (2) jurors should evaluate the testimony of cooperating witnesses with greater caution than other witnesses; and (3) jurors could find that the State failed to prove his guilt if they found that a superseding intervening event caused the deaths in this case.

¶36        "[A] defendant is entitled to an instruction on any theory of the case reasonably supported by the evidence." *State v. Richter*, 245 Ariz. 1, 6, ¶ 24 (2018) (quoting *State v. Lujan*, 136 Ariz. 102, 104 (1983)). But a "*Willits* instruction is not given merely because a more exhaustive investigation could have been made." *State v. Murray*, 184 Ariz. 9, 33 (1995). We review the denial of a requested instruction for an abuse of discretion. *Richter*, 245 Ariz. at 4, ¶ 11.

### A.    *Willits* Instruction.

¶37        Law enforcement collected cellphones and phone numbers associated with the defendants, the CI, and the Broker. They tried to extract information from phones in their possession. They also submitted court orders to cellphone service providers to obtain call detail and cell site location information. The State used such information at trial to corroborate testimony about who participated in the drug rip and how. Although the State submitted a court order to AT&T for information from Royalty's phone number ending in -7474, the State never received that information. Carriers only retain such information for a limited time, and the State was unaware they lacked Royalty's phone information until it was too late to obtain it.[3]

¶38        Royalty argued he was entitled to a *Willits* instruction based on the absence of cellphone location records for his -7474 number. The standard instruction informs jurors:

> If you find that the State has lost, destroyed, or failed to preserve evidence whose contents or quality are important to the issues in this case, then you should weigh the explanation,

---

[3]    The State extracted information from the physical phone associated with the -7474 number, but the data amounted to thousands of pages, it did not include location information, and the records were not admitted at trial.

if any, given for the loss or unavailability of the evidence. If you find that any such explanation is inadequate, then you may draw an inference unfavorable to the State, which in itself may create a reasonable doubt as to the defendant's guilt.

Rev. Ariz. Jury Instr. ("RAJI") Stand. Crim. 42 (lost, destroyed, or unpreserved evidence) (4th ed. 2016).

**¶39** "To be entitled to a *Willits* instruction, a defendant must prove that (1) the state failed to preserve material and reasonably accessible evidence that could have had a tendency to exonerate the accused, and (2) there was resulting prejudice." *State v. Glissendorf*, 235 Ariz. 147, 150, ¶ 8 (2014) (cleaned up). The trial court denied Royalty's request for the instruction, ruling that he failed to establish the first prong of *Glissendorf*. The court reasoned that the State never came into possession of the AT&T records, Royalty could have independently obtained them, and Royalty did not substantiate his claim that he detrimentally relied on the State acquiring the records. *See State v. Geotis*, 187 Ariz. 521, 525 (App. 1996) (finding no *Willits* instruction warranted where the State never took possession of the evidence at issue and the defendant could have independently sought to obtain it).

**¶40** The trial court's ruling shows no abuse of discretion. The court gave Royalty an opportunity to show that he tried to obtain the records after learning that the State never received them. Royalty does not dispute the court's finding that he could have independently obtained the records—or at least tried to do so.

**¶41** Royalty also fails to show the records' absence prejudiced him. *See State v. Perez*, 141 Ariz. 459, 464 (1984) ("We are obliged to affirm the trial court's ruling if the result was legally correct for any reason."). Royalty offers no evidence to support his argument that the records would have provided him an alibi for the events of July 28, and his assertion to the contrary conflicts with the testimony of many trial witnesses, photographic evidence, and his implicit acknowledgment that he was seen outside the Maldonado house a couple of hours before the shooting. Under the circumstances, Royalty does not establish that admission of the phone records at trial would have aided his defense. *See id.* (concluding that the destruction of a videotape did not prejudice the defendant where an eyewitness unequivocally identified the defendant as the perpetrator and the defendant offered no proof that the tape "would have proven his mistaken identity defense"); *see also State v. Hernandez*, 250 Ariz. 28, 33–34,

¶ 20 (2020) (explaining that a defendant must offer more than speculation about how lost or destroyed evidence could have had a tendency to exonerate him).

### B. Cooperating Witness.

**¶42** Gittens and C.R. both provided information to the State, and agreed to testify at Royalty's trial, in order to receive benefits in their own criminal proceedings.[4] Royalty and codefendant Cockhearn both asked for a jury instruction, apparently modeled after one used in some federal courts, that informed jurors they should consider the testimony of a cooperating witness "with greater caution than that of other witnesses." The trial court denied the request—agreeing with the State's argument that the proposed instruction would put a "finger on the scale" by asking jurors to evaluate the testimony of cooperating witnesses different from all other witnesses.

**¶43** Royalty challenges the court's ruling on appeal. He argues that the proposed instruction reflects a decision of this court describing "police informants" as "often inherently unreliable." *See State v. Collins*, 21 Ariz. App. 575, 577 (1974) (explaining why a search warrant affidavit based on a tip from a confidential informant must include facts showing why the tip is reliable). He also points to jury instructions given in other state courts, and the Ninth Circuit, that direct jurors to consider whether the testimony of an informant or cooperating witness has been influenced by benefits from the government.

**¶44** The trial court did not abuse its discretion because it correctly observed that the proposed instruction would conflict with other jury instructions. Indeed, our supreme court has held that an "instruction requiring the jury to scrutinize more closely the testimony of a witness who provides evidence because of [an agreement with the government] than it would the testimony of an ordinary witness" is "contrary to the law of this state and would amount to an impermissible comment on the evidence." *State v. Baumann*, 125 Ariz. 404, 410 (1980).

### C. Superseding Intervening Event.

**¶45** Royalty also sought an instruction on superseding cause. The standard instruction informs jurors that they must find that the defendant

---

[4] C.R. was found to possess a large amount of drugs when authorities came to his house in Tennessee in search of Royalty. C.R. was not charged with any crimes relating to this case.

proximately caused the victim's death or injury and that "[p]roximate cause does not exist if the chain of natural effects and cause . . . is broken by a superseding intervening event that was unforeseeable by the defendant and, with the benefit of hindsight, may be described as abnormal or extraordinary." RAJI Stat. Crim. 2.03 (causation instruction—intervening event) (4th ed. 2016). Royalty and codefendant Cockhearn proposed several possible intervening events, but the trial court declined to give the instruction. The court found there was no intervening event and that even if there were, such event was not "unforeseeable" or "extraordinary." *Id.*

**¶46** Royalty argues on appeal that the instruction was warranted by Detective D.B.'s reaction to seeing Jackson aim at him with a semiautomatic rifle. The CI testified that he felt Detective D.B. was inexperienced and that if he had stayed calm upon seeing Jackson with the rifle, the shootout would not have occurred.

**¶47** The trial court did not abuse its discretion by refusing to give a superseding cause instruction because Detective D.B.'s conduct was not a superseding intervening event. As the Arizona Supreme Court recently explained, an event must first be found to be "intervening," and if so, then "superseding," to break the chain of causation. *State v. Aragón*, 252 Ariz. 525, 529, ¶ 10 (2022). An intervening event is one "of independent origin" that "actively operates in producing harm *after* the original actor's . . . act or omission has been committed." *Id.* at ¶ 11 (citations and internal quotation marks omitted). The intervening event must "in no way [be] connected" with the defendant. *State v. Dodd*, 244 Ariz. 182, 185, ¶ 10 (App. 2017). Detective D.B.'s conduct was not an intervening event because it did not arise from an "independent origin" but instead resulted from Jackson's conduct with which Royalty is connected. *Aragón*, 252 Ariz. at 529, ¶ 10. Royalty's argument that an intervening event may be "dependent" on the original actor's wrongful conduct is contrary to the law of this state. *Id.*

**¶48** Even if Detective D.B.'s reaction was an intervening event, the trial court correctly found that the detective's conduct was not a superseding cause because it was not "unforeseeable and extraordinary." *Ontiveros v. Borak*, 136 Ariz. 500, 506 (1983) (defining superseding cause as "an intervening act of another [that] was unforeseeable by a reasonable person in the position of the original actor" and that "appears extraordinary" to one "looking backward, after the event"). Royalty and his confederates planned an armed robbery in circumstances where most, if not all, parties were assumed to be armed. It should have been no surprise, in foresight or hindsight, that the targets of the robbery might react in self-defense when guns were pulled on them. *See State v. Lopez*, 173 Ariz. 552,

555 (App. 1992) ("It was reasonably foreseeable that the robbery attempt would meet resistance. This set into motion the chain of events which caused the death of [the victim]." (quoting *State v. Moore*, 580 S.W.2d 747, 752 (Mo. 1979), in a discussion about the foreseeability of a shooting death provoked by an attempted robbery)).

**CONCLUSION**

¶49        We affirm Royalty's convictions and sentences.



AMY M. WOOD • Clerk of the Court
FILED:     AA